Lorenzo REYNA, Appellant,

v.

The STATE of Texas, Appellee.

No. 08–02–00233–CR.

Court of Appeals of Texas,
El Paso.

Aug. 28, 2003.

M. Clara Hernandez, El Paso County Public Defender, El Paso, for appellant.

Jaime E. Esparza, District Attorney, El Paso, for State.

Before Panel No. 3 BARAJAS, C.J., LARSEN, and CHEW, JJ.

## OPINION

SUSAN LARSEN, Justice.

Lorenzo Reyna appeals his convictions for aggravated assault and deadly conduct, following a jury trial. Finding that the jury's guilty verdict was against the great weight and preponderance of the evidence supporting Reyna's insanity defense, we reverse and remand.

### Facts

On February 7, 2001, Lorenzo Reyna took a .22 caliber rifle from a trunk in his mother's and stepfather's house in Clint, Texas, walked several miles to mile marker 42 on Interstate 10, and started shooting at cars as they drove along the highway. He hit one motorist, who called 911 and alerted the police. When the police arrived, they found the rifle on the ground and Reyna wandering in the desert nearby. He did not resist arrest or flee.

The police who investigated the shooting scene found prints from cowboy boots running up and down an embankment under an overpass. Reyna was wearing cowboy boots when the police found him. A number of shell casings were near the highway, along with the rifle. Some of the shell casings were at the embankment, others were found leading to where the rifle was found.

Very early that morning, Reyna arrived at the house of his mother and stepfather. He had just returned to the United States after deportation. That day he helped his stepfather move furniture around the house and paint the kitchen. According to the stepfather, Reyna actually helped place the paint in a container, but then just sat and started talking to himself and laughing. After taking a bath, his family invited him to go to church, but he said that he would go later. His mother testified that on that day, "I didn't see him mad or upset. I just saw that he was very thoughtful, thinking. But for me this was not new because I would always see him talking to himself, laughing by himself."

The evidence shows this is a common state for Reyna. His sister explained that when she sees Reyna, "He usually talks to somebody. He talks to somebody. We don't see nobody, but we think that maybe it's some mental problem. He talks to somebody. He acts like a child, like a kid. He writes letters. He writes letters. Sometimes we don't understand what he's trying to tell us or explain to us. He's sometimes very weird." Although she had not seen Reyna on the day of the shooting, she testified that she and other family members have observed this type of activity over the last four or five years. She clarified that Reyna was not just talking to himself, but rather "he's talking to somebody, that he's looking and that he's seeing somebody, but there is nobody there." Reyna's mother thought of taking him to see a doctor for this behavior, but she never had the means to do it.

The police were not able to take Reyna's statement after his arrest because he was incoherent. Detective Onesimo Esparza testified that Reyna was talkative, he just was not answering questions. "He knew where he was at. He knew he was under arrest. He knew he was at the patrol station, but the questions that we asked him, he wouldn't answer them." Detective Esparza gave an example: "[W]e asked

him a question about the particular case that we were investigating, and he'd come up with something else, that he was working for Amado Carrillo and that he was a hit man for Amado Carrillo, things that we weren't asking him for." Because of this, the detectives thought that Reyna was incoherent and could not make a statement. Reyna did tell the officer that he had shot somebody.

Detective Michael Torres confirmed the testimony of Detective Esparza that Reyna was not coherent and would respond to questions and then he "went off in different directions." No written statement was taken because Detective Torres thought that "it wouldn't stand." He also testified that when he first started to speak with Reyna, Reyna appeared to be coherent and oriented in time and place. Reyna's problems appeared, to him, to surface five to ten minutes into the interview. This, too, appears to be normal for Reyna; his mother testified that occasionally "we were talking with him about something, and then he would talk with us of something totally different, as if he was not able to understand what we were talking about."

Dr. Mariam A. Marvasti[1] testified that in her opinion, Reyna was competent to stand trial, but at the time of the shooting he was insane and could not appreciate the wrongfulness of his acts. This was based on a number of competency and sanity examinations, and her treatment of Reyna as the jail psychiatrist. She also spoke with the detectives on the case, interviewed members of the family, and read the police report from the time of the arrest. Dr. Marvasti first treated Reyna because the nurses and the jailer reported that he was not acting normal and was hearing voices. At that time, shortly after his arrest, he had a number of delusions including that the Mexican Mafia was after him, that he was born of Jesus, and that he saw panthers in his cell. Because of the visions and voices that Reyna was seeing and hearing, Dr. Marvasti prescribed a number of medications. Reyna was placed on Haldol for the hallucinations. He was also given Benadryl to help him sleep and Cogentine to alleviate the side effects of the antipsychotic medicine.

Reyna told the social worker Ana Viera in a February 20 evaluation that he was a cat and that he had killed Selena and Yolanda Saldivar. When Dr. Marvasti first contacted Reyna, he told her that someone owed him a million dollars in Juarez and a million dollars in El Paso. The drug cartel had to pay him for the murder, he said. He also expressed a desire to kill his mother.

When asked about his medical history, Reyna told Dr. Marvasti that he was placed in a hospital in Colorado because he went to the police there and told them that agents from the Mexican Mafia were following him and wanted to kill him. Dr. Marvasti found no records of any treatment or commitment, however. Additionally, in 1993 Reyna slashed his wrists. At the age of sixteen, he overdosed on cocaine.

Dr. Marvasti testified that, at the time of the shooting, Reyna was suffering from a psychosis. He was delusional, hearing voices, seeing things and having beliefs that were not real. He also suffered from polysubstance abuse, meaning he had abused several drugs in the past, including alcohol, marijuana, cocaine, and spray paint. The drug abuse over a long term may have led to a psychotic disorder.

---

1. Dr. Marvasti originally met with Reyna in her role as a jail psychiatrist. Later, she was appointed to determine his competency to stand trial and his sanity at the time of the offense by the trial judge.

From this, Dr. Marvasti concluded that to a reasonable medical certainty, Reyna was insane at the time of the shooting and was not aware that what he was doing was wrong.

During cross-examination Dr. Marvasti read from her evaluation the basic structure of Reyna's day on February 7:

> The Defendant stated that he was deported to Mexico, but he crossed the border, came back to El Paso a couple of days later. He walked to his mother's house in Clint. He said he got upset with his mother because they did not want him there. Then his mother and stepfather left to the church. He found a rifle, which belonged to his stepfather. He walked toward the freeway and started shooting because he felt angry with his stepfather. He said he had the intentions to kill people because 'I don't like my mother telling me anything or scolding me and blaming me for everything.' At this point he smiled and said, 'I shot a police car.'

He indicated to Dr. Marvasti that shooting the police car "was very inappropriate." Reyna has a history of acting out in anger.

Dr. Marvasti described her method of evaluation. She explained that she could not rely on Reyna's self-reporting; rather, she looked to his actions and the police reports. Specifically, Dr. Marvasti asked Detective Torres about the appearance of drug consumption influencing Reyna's actions at the time of the shooting. There was no indication that Reyna was under the influence of drugs or alcohol. She also spoke with Reyna's parents.

A paper in Reyna's handwriting was found in the house listing members of Reyna's family and others, with various notations including "chinca [sic] tu madre" and "pagame"—"fuck your mother" and "pay me." Dr. Marvasti found the note to be incoherent. She mentioned that "[n]ow he knows that killing is a bad thing," placing emphasis on "now" being at the time of trial. At the time of the shooting, she explained, he was aimlessly shooting at people with whom he was not angry. Reyna did not resist arrest and just stopped when the police stopped him. He told the officer that "he was born of Jesus Christ. He was powerful. He could kill. You know, it didn't make sense what he did." Reyna's stepfather testified that Reyna did not appear to be angry with either him or the mother. As the prosecutors gave examples geared to make Dr. Marvasti admit that persons randomly shooting or shooting out of anger do not make a person legally insane, they did not question the specific criteria that Dr. Marvasti used in making her evaluation. Her report on the matter was introduced as the sole exhibit for the defense.

To each count, Reyna pleaded not guilty. The jury found him guilty on both counts, implicitly rejecting the insanity defense, and assessed punishment at ten years' confinement on the offense of aggravated assault and five years' confinement on the offense of deadly conduct.

## Great weight of the evidence supports insanity

Reyna's sole issue on appeal is that the jury's rejection of his insanity defense was against the great weight and preponderance of the evidence. We agree.

### The insanity defense

Insanity is an affirmative defense. Tex. Pen.Code Ann. § 8.01 (Vernon 2003). The defendant bears both the burden of proof and the burden of persuasion. *Meraz v. State,* 785 S.W.2d 146, 150 (Tex. Crim.App.1990). The purpose of the insanity defense is to determine whether the accused should be held responsible for the crime, or whether a mental condition ex-

cuses defendant from such responsibility. *Graham v. State,* 566 S.W.2d 941, 948 (Tex.Crim.App.1978). A defendant cannot be convicted of a criminal offense if legally insane at the time of the crime; the essential question is whether at the time of the conduct charged, the defendant as a result of severe mental disease or defect, did not know the conduct was wrong. *See* TEX. PEN.CODE ANN. § 8.01(a).

 The issue of insanity is not strictly medical in nature, but involves legal and ethical considerations as well. *Bigby v. State,* 892 S.W.2d 864, 877 (Tex.Crim.App. 1994); *Love v. State,* 909 S.W.2d 930, 943 (Tex.App.-El Paso 1995, pet. ref'd). An individual may be medically insane, yet legally retain criminal responsibility for that crime where a mental condition does not prevent defendant from distinguishing right from wrong. *Graham,* 566 S.W.2d at 948; *Love,* 909 S.W.2d at 943. In determining the issue of legal insanity, the trier of fact is called upon to join the non-medical components in deciding the ultimate issue of culpability. *Bigby,* 892 S.W.2d at 878. Expert witnesses, although capable of giving testimony that may aid the jury in determining the issue, do not dictate the result. *Graham,* 566 S.W.2d at 949. However, the jury may not arbitrarily disregard expert testimony. *Id.* at 950. It is not necessary for the State to present expert medical testimony that a defendant is sane in order to counter the defense experts' testimony regarding insanity. *Id.; Mitten v. State,* 79 S.W.3d 751, 758–59 (Tex.App.-Corpus Christi 2002, pet. granted). The issue of insanity at the time of the offense lies in the province of the jury not only with regard to the credibility of the witnesses and the weight of the evidence, but also as to the limits of the defense itself. *Graham,* 566 S.W.2d at 948; *Love,* 909 S.W.2d at 943.

### Standard of review

 In analyzing a claim that a guilty verdict was against the great weight and preponderance of the evidence supporting an insanity defense, we consider all evidence relevant to the issue of insanity in a neutral light to determine whether the finding against the affirmative defense is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Bigby,* 892 S.W.2d at 875; *Meraz,* 785 S.W.2d at 155. *Mitten,* 79 S.W.3d at 757; *Love,* 909 S.W.2d at 943; *see also Johnson v. State,* 23 S.W.3d 1, 7 (Tex. Crim.App.2000); *but see Dashield v. State,* 110 S.W.3d 111, 116 (Tex.App.-Houston [1st Dist.] 2003, no pet. h.) (greater deference given to the trial court's judgment, over vigorous dissent). We inquire whether a rational trier of fact could have determined the defendant failed to prove the defense of insanity by a preponderance of the evidence. *Love,* 909 S.W.2d at 943. Even where the finding of guilt might be adequately supported if taken alone, it may still be against the great weight and preponderance of evidence when viewed using the proper standard. *Bigby,* 892 S.W.2d at 875. The issue of insanity at the time of the offense lies within the province of the jury, and we will overturn its decision only where insanity is undisputed or resolved to one end of the spectrum outside the realm of discretion. *Bigby,* 892 S.W.2d at 878.

### Great weight of evidence supports insanity

 The record here is replete with evidence that Reyna did not understand the wrongfulness of his actions at the time he shot at anonymous motorists on an interstate highway. His mother, stepfather, and siblings all testified that he had a history of conversing with hallucinations.

He displayed this delusional behavior on the day of the shooting. If he had received any treatment at all for his mental illness, he was not receiving it at the time of this shooting. Detectives found him near the scene of the shooting, he was not attempting to hide, and the shells and rifle were left near the highway, with no evidence of any attempt to conceal them. After his arrest, officers were unable to take Reyna's statement because his responses to questioning were incoherent. Dr. Marvasti treated Reyna, in her capacity as the jail psychiatrist, for auditory and visual hallucinations, and delusions of being hunted by the Mexican Mafia, having killed Selena and Yolanda Saldivar, and his search to kill the killers of Christ and Carlos Fuentes. Reyna did not know the people he shot, and apparently did so without motive or any expectation of gain. These facts, all presented to the jury, supported Dr. Marvasti's opinion that at the time of the shooting, Reyna was insane and incapable of appreciating the wrongfulness of his actions.

### The State's contentions

The State did not present conflicting testimony, relying instead on cross-examination to counter the establishment of a defense of insanity. We conclude this was simply inadequate to rebut Reyna's proof that he was insane when this incident occurred. In so deciding, we distinguish this case from others where courts have found that circumstances surrounding the crime may controvert lay and medical evidence of insanity. For example, attempts to conceal incriminating evidence or to elude officers can indicate the defendant's knowledge of guilty conduct. *Graham,* 566 S.W.2d at 951. Defendant's lucidity before the commission of the crime, other possible motives for committing the crime, other explanations for erratic behavior, attempts to eliminate witnesses, and expressions of regret and fear of the consequences may serve as evidence supporting guilt. *Torres v. State,* 976 S.W.2d 345, 352 (Tex.App.-Corpus Christi 1998, no pet.). Any such evidence rebutting insanity is lacking here.

Moreover, the evidence may be sufficient to sustain a guilty verdict if it indicates that the defendant subjectively knew that his acts were wrong. *Bigby,* 892 S.W.2d at 878 (noting that expert testimony that defendant knew his acts were "illegal" by societal standards is enough to show defendant knew his acts were "wrong" and sufficient to uphold conviction); *Mitten,* 79 S.W.3d at 751, 759 (finding pulling telephone from wall at crime scene, exculpatory oral statements blaming one of the victims for the murder of the other, an attempt to avoid leaving fingerprints on a phone at the police department, and a comment on his jealousy concerning the victim to be sufficient evidence to show that defendant knew right from wrong at the time of stabbing); *Love,* 909 S.W.2d at 930, 943 (finding that witness testimony of defendant's lucidity, actions by defendant to avoid drawing attention to himself as he drove past a police station, and a potential motive for the crime of trying not to be returned to a medical facility supported conviction); *Plough v. State,* 725 S.W.2d 494, 500 (Tex.App.-Corpus Christi 1987, no pet.) (finding that although strong evidence of mental illness was presented, attempts to conceal incriminatory evidence and elude officers revealed a cognizance of wrongful conduct supporting conviction by jury). Conversely, failure to show this ability to distinguish right from wrong, in the face of strong evidence establishing the affirmative defense of insanity, will not constitute factually sufficient evidence of guilt. *Morgan v. State,* 869 S.W.2d 388, 390 (Tex.App.-Tyler 1993, pet. ref'd) (reversing conviction and remanding cause where defense expert and lay testimony

was found to be more reliable and convincing than that presented by the State); *Olivier v. State*, 850 S.W.2d 742, 745 (Tex. App.-Houston [14th Dist.] 1993, pet. ref'd) (reversing conviction and remanding cause where defense evidence was "lengthy, convincing, and uncontradicted" by the State with either medical or lay testimony). The State here did not present evidence that could lead a reasonable jury to believe that Reyna could have known his acts were wrong, and rebutting the evidence supporting the affirmative defense provided by section 8.01.

The State asserts that there is sufficient evidence for the jury to have found that Reyna was capable of determining right from wrong at the time of the offense. First they point out that he indicated to Dr. Marvasti that shooting the officer was "very inappropriate." Notably, this is from an interview that took place long after the shooting. This acknowledgment by Reyna does not speak of his understanding at the time of the offense. The State also points to testimony that he may have acted out of anger and that anger does not make one legally insane. Again, this argument misses the mark. Insane people can be angry or not; angry people can be sane or insane. The two traits are neither companions of one another nor are they exclusive of one another. Although there may be more of a connection if the victim was the object of Reyna's anger, or even connected in some way to that object, such is not the case here. The motorists on Interstate 10 were wholly unconnected in any way to Reyna or his family.

Through cross-examination, the State also drew from Dr. Marvasti testimony that schizophrenics can have moments of lucidity, and delusional people can still know right from wrong. Again, these matters do not undermine the great weight of evidence presented by the defense. If anything, they show that Dr. Marvasti was aware of the universe of mental illness when she made her assessment of Reyna's condition. The State points out the police were able to converse with Reyna for a few minutes before his answers became incoherent. This however, does not present any proof of the likelihood that he could distinguish right from wrong at the time without giving any of the substance of the conversation. The State here was unable to muster the type of evidence that the courts relied upon in upholding the guilty verdicts in *Bigby, Mitten, Love,* or *Plough*. Nor was cross-examination an effective attack on the reliability of testimony and conclusions of Dr. Marvasti or the family members.

We must conclude the judgment in this case was overwhelmingly against the great weight and preponderance of evidence on the threshold question of whether the defendant could distinguish right from wrong. No rational jury could decide from the evidence presented that Reyna was able to appreciate the wrongfulness of his actions. Their rejection of this evidence appears arbitrary to this Court. Reyna's sole point for review is sustained.

## Conclusion

For the foregoing reasons, the judgment of the trial court is reversed and the cause is remanded for a new trial.