COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS




PATRICK WAYNE BOYD II,

                            Appellant,

v.

THE STATE OF TEXAS,

                            Appellee.

§
 
§
 
§
 
§
 
§
 
 § 


No. 08-05-00372-CR

Appeal from the

Criminal District Court Number Five 

of Dallas County, Texas 

(TC# F-0325968-VL)





O P I N I O N

            Appellant Patrick Wayne Boyd II appeals his conviction for murder. A jury found Appellant
guilty, and the court assessed punishment at life in prison. He appeals his conviction in two issues. 
For the reasons that follow, we affirm.
FACTUAL SUMMARY
            The Appellant killed his mother, Janet Cantrell, on March 19, 2003. He began the attack by
strangling her with his hands and then stabbing her multiple times with three different kitchen
knives. His older sister, Christi Boyd, and a neighbor both attempted, without success, to stop the
attack. When a police officer arrived on the scene, the Appellant was sitting on top of his mother,
still stabbing her. When Boyd did not respond to orders to stop, the officer opened fire. When he
finally stopped stabbing and fell over, the Appellant had been shot four times.
            Early in the morning on March 19, Cantrell called her daughter, Christi, and asked her to
check on her brother. Cantrell had spoken with the Appellant on the phone that morning and was
worried about him. When Christi arrived at her brother’s apartment, he was acting strangely. Over
the next few hours, he made several strange comments. He told Christi, “Mom is evil” and “Mom
has to die.” Later, while they were looking at some family photos, he added, “I can’t do it. You
can’t do it. I’ll live the rest of my life in jail. I’ll keep doing what I’m doing, as long as she’s alive.” 
He pointed to a group of family photos -- pictures of himself, his father, and his son -- and said “the
Father, the Son, the Holy Ghost.” Later that morning, the Appellant asked Christi and his girlfriend,
Char Clark, to kill him. After they assured him they loved him and would not hurt him, Boyd asked
to speak to his mother.
            The Appellant said he was angry with his mother because she had lied to him and was trying
to take his son away. He said Cantrell was trying to turn the family against him. He was convinced
that his mother had tried to kill him several years earlier, and he wanted her to admit it.


 Christi
testified that she was concerned that morning that the Appellant was having a panic attack similar
to the ones he had suffered from briefly as a teenager.



            Christi called Cantrell and convinced her to come and discuss these issues with the
Appellant. As they waited for her mother, Christi’s boyfriend, Gabe, arrived. He and Boyd talked
by themselves for a few minutes on the porch without any problems. The Appellant had calmed
down and seemed normal, but when the conversation ended, his mood changed again. He made
unusual statements, such as telling the group that they were “targeting the wrong thing.” He said,
“You are all in denial.” Then he called all three to his room, back to the photos. Again, he referred
to the family picture and said, “Father, Son and the Holy Ghost.”
            When Cantrell finally arrived at the apartment, the Appellant had calmed down once more. 
Mother and son talked and cried and hugged each other. Gabe left shortly thereafter to return to
work, and the Appellant asked Clark to go as well. A few minutes after they left, the Appellant
began accusing his mother of lying, trying to take his son away, and trying to kill him. When
Cantrell refused to admit that she had tried to kill him, the Appellant flew into a rage.
            The Appellant began his attack by choking his mother with his hands. Christi eventually
made him stop by pulling individual fingers away from their mother’s neck. As Christi helped her
mother up off the floor, the Appellant returned with a kitchen knife and started stabbing his mother,
with Christi still standing between them. Boyd told his sister, “She’s evil. She has to die.” When
the blade on the first knife failed, he ran to the kitchen for a bigger one and started stabbing his
mother again. Christi tried to use the phone to call for help, but Boyd paused his attack just long
enough to cross the room, knock the phone out of her hand, and shove her to the floor. Christi
testified that she knew from the expression on Boyd’s face that he understood why she was trying
to use the phone. The attack continued in the house, then the Appellant dragged Cantrell outside. 
Christi grabbed her cell phone to call 911 and followed the attack outside, where she screamed for
help.
            A neighbor responded to Christi’s calls for help and approached the Appellant with a baseball
bat. When the Appellant moved as if to attack him, the neighbor retreated inside and also called the
police.
            When the police officer arrived, he found the Appellant sitting on his mother’s body, still
stabbing her. The officer ordered the Appellant to drop the knife several times without response
before he shot him. The first shot knocked the Appellant back slightly, but he regained his position
and resumed stabbing. The officer fired three more rounds before the Appellant finally fell over.
            The Appellant was charged with murder and plead not guilty by reason of insanity. The
primary fact question at trial was whether the Appellant was capable of knowing his conduct was
wrong at the time of the offense. The jury rejected his insanity defense and the court sentenced him
to life in prison. This appeal follows.
            In Issue One, the Appellant challenges the factual sufficiency of the jury’s failure to find him
legally insane at the time of the offense. In Issue Two, he argues that the trial court erred by defining
“reasonable doubt” in the jury charge. For the reasons that follow, we affirm.
DISCUSSION
            In his first issue, Appellant challenges the factual sufficiency of the jury’s failure to find him
legally insane.
            We review the factual sufficiency of a jury’s failure to find the defendant insane by asking
whether the judgment is so against the great weight and preponderance of the evidence as to be
manifestly unjust. Bigby v. State, 892 S.W.2d 864, 875 (Tex. Crim. App. 1994), cert. denied, 515
U.S. 1162 (1995); Reyna v. State, 116 S.W.3d 362, 367 (Tex. App.--El Paso 2003, no pet.). The
reviewing court considers all the evidence on the issue of insanity in a neutral light in order to decide
whether a rational trier of fact could have determined that the defendant failed to prove his defense
of insanity by a preponderance of the evidence. Reyna, 116 S.W.3d at 367. We will overturn the
jury’s decision only where insanity is undisputed or resolved to a point outside the realm of
discretion. Id.
            The Appellant argues that the evidence in support of an insanity finding was lengthy,
convincing, and uncontradicted. He contends that there was no testimony, expert or otherwise, from
which a rational jury could conclude he was legally sane at the time of the crime. We disagree.
            Insanity is an affirmative defense. Tex. Penal Code Ann. § 8.01 (Vernon 2003). The
defendant bears the burdens of production and persuasion that he was suffering from a mental defect
and that he did not know that his conduct was wrong. Id.; Reyna, 116 S.W.3d at 367. An individual
may be found to be medically insane, but remain criminally responsible for his actions, where his
mental condition does not prevent him from distinguishing from right and wrong. Id.
            The jury is the exclusive judge of the facts proved and the weight to be given the testimony. 
Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Jones v. State, 944 S.W.2d 642, 647 (Tex.
Crim. App. 1996), cert. denied, 522 U.S. 832 (1997). As a fact issue, the determination that a
defendant was insane at the time of the offense is within the sole province of the jury. Reyna, 116
S.W.3d at 367. The jury also acts as the judge of witness credibility, the weight to be given to the
evidence, and the limits of the defense itself. Id. The jury is also charged with the power to
reconcile conflicts within the evidence. Dashield v. State, 110 S.W.3d 111, 115 (Tex. App.--Houston [1st Dist.] 2003, pet. ref’d). A fact finder may consider all the circumstances surrounding
the offense to determine whether the defendant understood that his actions were wrong. See
Aschbacher v. State, 61 S.W.3d 532, 536-37 (Tex. App.--San Antonio 2001, pet. ref’d).
            The issue of insanity is not solely a medical one; it also involves legal and ethical
considerations. Reyna, 116 S.W.3d at 367. To make a determination regarding insanity, the jury is
charged to combine both the medical and non-medical evidence to determine the defendant’s
culpability. Id. Expert witness testimony may aid the jury in determining the issue, but it will not
dictate their decision. Id.; Dashield, 110 S.W.3d at 115. The jury may believe or disbelieve experts
or lay witnesses, as it chooses.  Dashield, 110 S.W.3d at 116. The State is not required to present
expert medical testimony that a defendant is sane to counter a defense expert’s testimony in support
of the defense. See Reyna, 116 S.W.3d at 367.
            Based on the testimony of his three expert witnesses, Boyd argues that the jury’s answer to
the insanity issue was against the great weight and preponderance of the evidence. In support of his
argument, the Appellant cites the testimony of two psychiatrists and one licensed social worker. 
Despite some disagreement over the specific diagnosis, the medical experts agreed that the Appellant
suffered from mental illness. However, the Appellant also had the burdens of proof and persuasion
that he was not able to comprehend that attacking and killing his mother was wrong. We will focus
our analysis on this second issue.
            Gary Neller, M.D., was the psychiatrist who treated the Appellant following his arrest. Dr.
Neller initially diagnosed the Appellant as suffering from major depression with psychotic features
and began treating him with anti-depressant medication. Later, Dr. Neller changed the Appellant’s
diagnosis to schizophrenia and prescribed anti-psychotic medications. In Dr. Neller’s opinion, the
Appellant’s anxiety and panic attacks as a teenager were actually the initial stages of schizophrenia.


 
He testified that the Appellant was suffering from a psychotic break at the time he attacked his
mother. Dr. Neller went on to testify that, because of his illness, the Appellant did not understand
that what he did that day was wrong.
            David Self, M.D., interviewed the Appellant at the District Attorney’s request in December
2004. Dr. Self testified the Appellant suffers from bipolar disorder with some psychotic symptoms.
            The doctor’s opinion on the Appellant’s ability to understand right and wrong was less
definite than Dr. Neller’s. When asked about the Appellant’s ability to understand that what he was
doing was wrong, the doctor answered: “I think it’s an interpretation that could be made of that
behavior, yes.” He went on to testify that it is rare for a person suffering from a psychosis to move
in and out of lucidity within a matter of minutes. The Appellant’s ability to“act normal” during his
conversations with Gabe and his ability to focus his attack on his mother while his sister tried to stop
him were evidence that he still had some control over his behavior. The doctor was also asked about
the Appellant’s ability to stop his attack, move across the room, and prevent his sister from calling
for help. He responded, “Yes sir. I was particularly disturbed by that event; that his behavior would
be that directed towards stopping her appeal for outside help.”
            According to Dr. Self, this was a particularly difficult case on the issue of wrongfulness,
because the Appellant was not able to tell the physicians what was going on in his head at the time
of the attack. During cross-examination, the doctor said:
Mr. Boyd has been unable to tell us -- states he’s unable to tell us much about his
internal state on that day. We just don’t have any evidence that comes from Mr. 
Boyd, about his mental workings. We have some observations of his behavior. We
have some fragmentary things from Mr. Boyd, but we don’t have enough to really
draw a conclusion.

            Kathy Finch was the social worker and psychotherapist assigned to the Appellant. While
she agreed with Dr. Self’s diagnosis of bipolar disorder, Finch was also less definite in response to
questions about the Appellant’s ability to know that his conduct was wrong. She opined that,
because of his psychosis, the Appellant was “not in touch with reality” at the time of the offense. 
When asked whether the Appellant knew the wrongfulness of his actions, she answered, “I don’t
think he did,” and, in another instance, “I think its kind of difficult, if you aren’t in touch with
reality.”
            Finch also admitted that the Appellant showed signs that he was thinking clearly at times. 
She testified that asking the police officers to wait outside his hospital room while he was talking
with a psychiatrist could have been either a sign that he was paranoid or a sign that he was thinking
clearly only hours after his arrest.
            The jury also heard the account of the Appellant’s sister, who testified that, during the attack,
he prevented her from calling for help.
A. I was trying to dial, and he stopped and came over and pushed the phone out of
my hand and pushed me down and then went back to Mom, and that’s when he
started dragging her into the dining room.

. . .
 
Q. But there’s no doubt in your mind that, based on his facial expression and his
actions, he knew you were using the phone when he came and knocked it out of your
hand?
 
A. Oh, yes.
            Christi also testified that, shortly before their mother’s arrival, the Appellant told her that his
mother needed to die, but that he could not do it because, “I’ll live the rest of my life in jail.” Shortly
after his arrest, while he was being treated for gunshot wounds, the Appellant refused to talk with
a psychiatrist about the incident with police officers present in his hospital room. He was aware
enough of the situation to ask the officers to step outside.



            Based on the evidence we have outlined above, the Appellant did not prove the second prong
of legal insanity to a point outside the realm of discretion. The jury could reasonably have inferred
that, although the Appellant was medically ill, he still had the ability to understand that his conduct
was illegal. Accordingly, the jury’s rejection of the Appellant’s insanity defense is not against the
great weight and preponderance of the evidence, and we overrule Issue One.
            In Issue Two, Boyd argues that the trial court committed reversible error by defining
reasonable doubt in the jury charge. Review of alleged jury charge error requires a reviewing court
to make a two-pronged inquiry: (1) whether error existed in the charge and, if so, (2) whether
sufficient harm was caused by the error to require a reversal. Middleton v. State, 125 S.W.3d 450,
453 (Tex. Crim. App. 2003). When the defendant has properly objected to the alleged charge error,
the standard for reversal is “some harm.” Bessey v. State, 199 S.W.3d 546, 552 (Tex. App.--Texarkana 2006, pet. granted). To reverse a conviction based on jury charge error without a timely
trial objection, we must determine first that there was an error in the charge and second that the error
was “egregious.” Id.
            At the close of the guilt-innocence phase of trial, the jury was instructed:
The prosecution has the burden of proving the defendant guilty, and it must do so by
proving each and every element of the offense charged beyond a reasonable doubt;
and if it fails to do so, you must acquit the defendant.
 
It is not required that the prosecution prove guilt beyond all possible doubt; it is
required that the prosecution’s proof excludes all reasonable doubt concerning the
defendant’s guilt. 

There was no objection to the instruction. 
            Boyd argues that this instruction is a definition of “reasonable doubt,” in violation of Paulson
v. State, 28 S.W.3d 570, 573 (Tex. Crim. App. 2000). This Court has, however, previously
determined that it is not error to submit this precise instruction to the jury, as it is not a definition of
reasonable doubt. Torres v. State, 116 S.W.3d 208, 212 (Tex. App.--El Paso 2003, no pet.). Since
it was not error to submit the instruction, we need not reach the question of whether the Appellant
suffered any harm -- let alone egregious harm -- when the trial court did so. Issue Two is overruled.
            Having overruled both of Appellant’s issues, we affirm the trial court.
 
                                                                        KENNETH R. CARR, Justice

February 28, 2007

Before Chew, C.J., McClure, and Carr, JJ.

(Do Not Publish)