

## In The
## Court of Appeals
## Sixth Appellate District of Texas at Texarkana

_____

No. 06-09-00128-CR

_____

JAROD TAYLOR, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 188th Judicial District Court
Gregg County, Texas
Trial Court No. 37,969-A

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

MEMORANDUM OPINION

After he had initially been determined incompetent to stand trial, Jarod Taylor was later determined competent and he entered an open plea of guilty to the charge of aggravated sexual assault of a child. At that plea hearing, Taylor sought to be placed on deferred adjudication community supervision.[1] Instead, the trial court sentenced Taylor to ten years' incarceration. Taylor now appeals the trial court's judgment on two points of error: (1) he maintains that his trial counsel was ineffective because he failed to investigate the possible defense of insanity; and (2) he contends that because trial counsel did not inform him of his ability to enter a plea of not guilty by reason of insanity and he was unaware of it, his plea was not entered voluntarily. We overrule Taylor's points of error and affirm the trial court's judgment and sentence.

**Background, Taylor's Mental Status**

On August 16, 2008, Taylor was engaging in sexual intercourse with his six-year-old cousin when he was discovered by the victim's ten-year-old brother. At the time, Taylor was seventeen years old; he had been diagnosed with an IQ of about eighty-six, and Taylor's father testified that a doctor had described Taylor as having the intelligence level of a sixth grader. Upon being discovered, Taylor told the ten-year-old not to reveal what he had seen; later, when the children's grandmother returned home, Taylor repeatedly interrupted when the ten-year-old tried

---

[1]Although at the plea hearing neither Taylor nor his counsel used that term and the trial court did not mention deferred adjudication and referred to Taylor's request for "probation," we assume this was Taylor's goal, as only deferred adjudication community supervision was available to him in light of the charged offense. *See* TEX. CODE CRIM. PROC. ANN. art. 42.12, §§ 3, 5 (Vernon Supp. 2009). Also, one piece of paperwork filled out by Taylor for the plea hearing said the defense's plea recommendation was for deferred adjudication.

2

to tell the grandmother what had occurred. When police came to question Taylor about the offense, he told them, "I know what this is about." Taylor told the investigating detective that while the victim was lying on a bed, Taylor reached for a comb on the headboard when his penis accidently fell out of his pants and penetrated the young child's vagina.

Within a week of the offense Taylor's court-appointed attorney, Craig Bass, visited him in jail. Bass described Taylor as "scared to death"; Bass had difficulty communicating with Taylor about the offense and charge. Bass also said he believed, on the strength of what he learned from Taylor in that first interview, that Taylor understood the difference between right and wrong.[2] Bass experienced difficulty in communicating with Taylor during that interview and requested that Taylor be evaluated to determine his competency to stand trial.[3] In early October 2008, Taylor was examined by a physician, who found Taylor could not effectively communicate with his attorney and was therefore not competent to stand trial at that time. This competency evaluation was presented to the trial court about November 4, 2008; from the record before us, it appears Taylor was admitted to a state hospital in the third week of January 2009. While in the hospital, Taylor was administered antipsychotic medications. Later, at the hearing on Taylor's motion for new trial, there was testimony that Taylor had been prescribed these or similar medications for some time, and his mother saw to it that Taylor took the medications. However, Taylor's mother

---

[2]Bass said, "We had discussed what had occurred when I first met Jarod that first day on August 21st, I sat down and I asked him what happened, and he immediately told me what happened. It - - and it - - he made me feel like he knew the difference between right and wrong when he was explaining it to me."

[3]*See* TEX. CODE CRIM. PROC. ANN. art. 46B.003 (Vernon 2006).

3

died about five months before the sexual offense occurred and Taylor had become irregular about taking his medications, if he took them at all. On March 3, 2009, a second competency evaluation was performed. At this time, Taylor was found competent to understand and participate in the legal proceedings, including consulting and cooperating with his attorney. Of particular relevance to the instant appeal, the evaluation states that Taylor was able to "name[] and accurately define[] all four plea options available in the State of Texas. . . . Regarding the Not Guilty by Reason of Insanity plea, Mr. Taylor stated, 'saying that you were insane at the time of the crime, you did it but you were insane.'"[4]

The record does not indicate when Taylor was discharged from the hospital. On June 3, 2009, Taylor waived both indictment and a trial by jury and entered an open plea before the trial court. At that plea hearing, Taylor represented that his attorney had not pressured him to plead guilty, that he himself made the decision to plead guilty, and that he was in fact guilty of the charged offense of aggravated sexual assault of a child. The trial court explained to Taylor that there was no plea bargain agreement in place and that Taylor was eligible for community supervision or, alternatively, that his sentence could range anywhere between five and ninety-nine years' imprisonment. At the same time, the court explained that the charged offense was a "3g"

---

[4]The evaluation goes on to state Taylor, while in the hospital, had "no problem expressing his thoughts, wants and needs. His verbal ability is suggestive of average intelligence and he is considered to have the ability to testify relevantly should he choose to do so. When asked if he could be forced to testify, he responded, 'No, because it's the 5th Amendment.'"

4

offense[5] and if Taylor were sentenced to prison, the law would require that he actually be incarcerated at least half of the term to which he was sentenced. The trial court discussed Taylor's competency history and asked Bass if he had been able to effectively communicate with Taylor; Bass responded affirmatively. The trial court then asked Bass if he believed Taylor to be mentally competent; Bass answered, "Based on the Northeast [sic] Texas Mental Hospital's assessment, yes."

Taylor testified at the plea hearing; he told the trial court he was remorseful for the sexual assault. Taylor took responsibility and clearly acknowledged that he knew at the time his actions were wrong. In doing so, he said that he did not know what made him assault the young girl, but he knew it was wrong and that he was hurting her, but that he did not think anyone would discover what he had done. Taylor admitted that when the ten-year-old brother of the victim witnessed the assault, Taylor had told the boy not to tell anyone; he acknowledged lying to the detective who questioned Taylor when he told the detective the sexual contact was accidental. Taylor and his father (who also testified at the plea hearing) asked the trial court to place Taylor on deferred adjudication community supervision. Instead, the trial court sentenced Taylor to ten years' incarceration, and Taylor immediately announced that he wished to appeal the judgment.

Two months later, the trial court heard Taylor's motion for new trial. Trial counsel Bass testified that he would pursue a defense of insanity where the defendant "obviously doesn't know the difference between right and wrong, which fits the definition of insanity," and Bass believed

---

[5]*See* TEX. CODE CRIM. PROC. ANN. art. 42.12, § 3g; TEX. GOV'T CODE ANN. § 508.145(d) (Vernon Supp. 2009).

that Taylor understood the difference between right and wrong. In contrast to his testimony at the plea hearing, Taylor testified that he did not remember the offense or the events surrounding it, including the fact that he was discovered in the act by the ten-year-old cousin. Taylor said that at the time the offense occurred, he was not taking his medications, and when he did not take those medications, he did not understand the difference between right and wrong. When asked to explain the statement he gave to police, that the penetration occurred accidentally when Taylor was reaching for a comb, Taylor said, "Well, I wasn't - - I didn't know what to say to them [the police]. I wasn't in my right mind when he asked me them questions." Taylor did remember talking to the Gregg County community supervision officer Rex Fennell; he told Fennell he did not want to talk about the offense, not because Taylor knew it was wrong, but because "it was embarrassing." The trial court denied Taylor's motion for new trial.[6]

**Ineffective Assistance of Counsel**

The standard for establishing a claim of ineffective assistance of counsel is well established. *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on this claim, an appellant must prove by a preponderance of the evidence (1) that his counsel's representation fell below an objective standard of reasonableness and (2) that the deficient performance prejudiced the defense. *Id.* at 689; *Rosales v. State*, 4 S.W.3d 228, 231 (Tex. Crim. App. 1999). To meet this burden, the appellant must prove that the attorney's representation fell below the standard of

---

[6]Taylor's appellate point does not claim the trial court erred in failing to grant him a new trial, but rather claims his trial counsel was ineffective. Thus, we will not review the trial court's decision on the motion for new trial for an abuse of discretion; we will analyze the effectiveness of trial counsel under the applicable law.

prevailing professional norms and that there is a reasonable probability that, but for the attorney's deficiency, the result of the trial would have been different. *Ex parte Martinez*, 195 S.W.3d 713, 730 (Tex. Crim. App. 2006); *Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000). Under this standard, a claimant must prove that counsel's representation so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Strickland*, 466 U.S. at 686. When a defendant challenges the voluntariness of a plea entered upon the advice of counsel, contending that his counsel was ineffective, the voluntariness of the plea depends on (1) whether counsel's advice was within the range of competence demanded of attorneys in criminal cases and, if not, (2) whether there is a reasonable probability that, but for counsel's errors, the defendant would not have pled guilty and would have insisted on going to trial. *Ex parte Moody*, 991 S.W.2d 856, 857–58 (Tex. Crim. App. 1999) (applying *Strickland*, 466 U.S. at 694) (A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.). In a situation where counsel failed to advise a defendant of a possible affirmative defense, the determination of the "prejudice" inquiry of an ineffective assistance claim "will depend largely on whether the affirmative defense likely would have succeeded at trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

Taylor's claim of ineffective assistance of counsel rests upon his assertion that his counsel did not adequately investigate the possibility of raising an insanity defense. Taylor bases his claim on the Texas Court of Criminal Appeals's holding in *Ex parte Imoudu*, 284 S.W.3d 866

7

(Tex. Crim. App. 2009). In that case, Imoudu had been diagnosed with various mental illnesses about six or seven months before the commission of the offense with which he was charged; counsel neither investigated nor discovered the medical records detailing those mental illnesses, despite having concerns about Imoudu's competency as evidenced by the fact that he requested the trial court to order a competency examination for Imoudu. (Imoudu was found competent to stand trial.) Imoudu's trial counsel remained so concerned about Imoudu's behavior that he advised Imoudu and his family to accept the State's plea offer because counsel was worried about how Imoudu might behave should he have taken the stand to testify. *Id.* at 870.

Imoudu pled guilty and was sentenced to seventeen years' incarceration. Post-conviction, his counsel in a habeas corpus proceeding discovered "extensive" medical records, compiled while Imoudu was jailed on the felony charges to which he eventually pled guilty, as well as a misdemeanor offense, for which Imoudu had been jailed six months before the felony arrest. *Id.* at 868. These medical records indicated significant mental illness; in jail, Imoudu was prescribed antipsychotic medications, used to treat schizophrenia. Post-conviction, a psychiatrist reviewed these medical records and concluded that at the time of the offense, Imoudu suffered from untreated schizophrenia; as a result of that illness, he could not discern right from wrong and was, therefore, insane. *Id.* at 868–69, 871.

Taylor's case bears important distinctions from *Imoudu*. Although Taylor's trial counsel, Bass, did say when he first met with Taylor that he had difficulty communicating with him and this

led Bass to request Taylor be examined for competency, Bass also said that at that initial meeting, Taylor told him about the offense. The manner with which Taylor told him of the occurrence led Bass to "feel like [Taylor] knew the difference between right and wrong when he was explaining it to me." Bass said it would be his practice to present an insanity defense[7] where the defendant did not know the difference between right and wrong, but that Bass believed Taylor comprehended that difference. Thus, the record demonstrates a basis for Bass's trial strategy and for not presenting a defense of insanity.

Additionally, we find it significant that immediately after Taylor was caught in the act of sexual assault, he engaged in conduct which was plainly an attempt to hide his culpability: (1) he told the ten-year-old cousin who witnessed the offense not to tell anyone; (2) when the child's grandmother returned home and the ten-year-old tried to tell her what had happened, Taylor repeatedly interrupted the boy; (3) when police questioned Taylor, he told them, " I know what this is about," and he told the detective investigating the case that he had only been reaching for a comb when his penis fell out and accidently penetrated the young victim. This conduct shows cognizance of guilt, or that Taylor knew he had done something wrong. Conversely, in *Imoudu*, there is no indication the defendant engaged in any conduct trying to distance himself from culpability or indicating he knew his acts were wrong. In *Martinez*, 195 S.W.3d at 721–22, the Texas Court of Criminal Appeals found counsel was not ineffective for failing to present a

_____

[7]"It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." TEX. PENAL CODE ANN. § 8.01(a) (Vernon 2003).

9

mitigation defense of temporary insanity where there was evidence Martinez knew his acts were wrong—he confessed to police; denied taking drugs or alcohol (his habeas claim of ineffective assistance said trial counsel should have pursued a temporary insanity defense based on voluntary intoxication); and he told friends he could not believe he had committed the murders. We find Taylor's acts evincing a consciousness of guilt a significant distinction from *Imoudu*.

Taylor nonetheless points to similarities in his case and the circumstances of *Imoudu*. Where Imoudu's trial counsel failed to discover the medical records indicating the possibility of mental defects, Taylor cites to Bass's admitted failure to research psychological evaluations compiled about two months before the charged offense. Bass acknowledged doing no research on either the medical reports provided by Taylor's family or on Abilify, an antipsychotic medication the family had indicated to Bass that Taylor was supposed to take. However, Bass did testify he gave the medical reports to the physician who did the first competency examination of Taylor. These medical reports, consisting of evaluations by a psychologist and a psychiatrist performed in June and July 2008, made no suggestion that Taylor suffered from hallucinations or delusions or that Taylor was unable to discern right from wrong. Although Taylor and his father both testified that Taylor had been diagnosed as bipolar and as suffering paranoid schizophrenia, there is nothing in the record substantiating these claims. It is true the doctor who performed the first competency evaluation, finding Taylor not competent to confer with his attorney and stand

trial, diagnosed "[p]ossible prodromal[8] schizophrenia" and stated Taylor's "age is during the peak age of onset of schizophrenia (late teens to early 20s)," but the evaluation also states that the scope of the evaluation did not extend to Taylor's sanity at the time of the offense. This evidence is much different, and substantially weaker, than that present in *Imoudu*.

Also different from *Imoudu*, Taylor presented no expert evidence supporting a possible assertion of insanity at the time of the offense. Whereas Imoudu had an affidavit from a psychiatrist who concluded that Imoudu did not know right from wrong at the time of the offense, Taylor presented his own testimony that due to his intermittent or nonexistent use of his prescribed medications, he did not know right from wrong at the time of the offense. He also presented testimony from his pastor, who offered his nonexpert opinion that at the time of the offense, Taylor did not know right from wrong. This lay testimony bears a striking difference to the expert evidence offered in *Imoudu*.

Because Bass believed Taylor could discern right from wrong, and Taylor has presented no significant evidence to undermine Bass's belief, we cannot say Bass was ineffective for failing to further investigate the possibility of an insanity defense. Our conclusion is supported by the lack of expert evidence of the kind present in *Imoudu*.

---

[8] "[P]remonitory; indicating the onset of a disease or morbid state." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1513 (30th ed. 2003).

**Prejudice**

Even if, under *Imoudu*, we were to find trial counsel to have been ineffective for his failure to investigate an insanity defense, Taylor has not demonstrated prejudice, or that the outcome of his trial would likely have been different. At the new trial hearing, Taylor testified he would not have entered a guilty plea if his trial counsel had told him of the possibility of pleading not guilty by reason of insanity, indicating that he did not know that this was a possible strategy. However, where a defendant claims he or she would not have pled guilty and insisted on going to trial but for trial counsel's failure to advise the defendant of a possible affirmative defense, the *Strickland* "prejudice" analysis must give consideration to whether the affirmative defense would likely have been successful. *Hill*, 474 U.S. at 59; *Imoudu*, 284 S.W.3d at 870.

Taylor has failed to demonstrate that he could have successfully urged an insanity defense had he gone to trial on this matter. As pointed out above, the only evidence he produced (post-trial) that he did not know the difference between right and wrong, was the nonexpert testimony of Taylor and his pastor.[9] The Texas Court of Criminal Appeals relied on the psychiatrist's affidavit in finding the prejudice prong to have been satisfied in *Imoudu*. *Imoudu*, 284 S.W.3d at 871. Further, nothing in the psychological evaluations done on Taylor earlier in

---

[9]"[P]redicated lay opinion testimony when considered with facts and circumstances concerning an accused and of the offense may be sufficient to raise the issue [of insanity]." *Pacheco v. State*, 757 S.W.2d 729, 736 (Tex. Crim. App. 1988). That premise, though, along with the testimony of Taylor and his pastor, in this case, do not convince us the insanity defense could have been successfully raised here, i.e., that Taylor was likely to have been acquitted had he presented the defense at trial. *Cf. Reyna v. State*, 116 S.W.3d 362, 369 (Tex. App.—El Paso 2003, no pet.), where "[n]o rational jury could decide from the evidence presented that Reyna was able to appreciate the wrongfulness of his actions."

12

the summer of the offense establish a mental defect of such magnitude as to impede his ability to discern right from wrong. Taylor has failed to show prejudice as required by *Strickland*; therefore, his claim of ineffective assistance of counsel fails. *See Conrad v. State*, 77 S.W.3d 424, 426–27 (Tex. App.—Fort Worth 2002, pet. ref'd) (although counsel was ineffective for failing to investigate Conrad's mental status, failure to put on any evidence he was actually insane at the time of offense doomed claim of ineffective assistance).[10]

**Voluntariness of Plea**

Taylor's second point of error claims that because he was not advised of the possibility of pleading not guilty by reason of insanity, his plea of guilty was not made voluntarily. Taylor presents no authority for this assertion. Rather, he cites his mental illness as evidence he did not know or appreciate the ramifications of his plea.

At the plea hearing, the trial court admonished Taylor of the range of punishment for the charged offense and of the requirement to register as a sex offender upon conviction for the offense at issue. He further pointed out that there was no plea bargain agreement in place. The trial court also summarized the competency proceedings and discussed with trial counsel whether counsel believed Taylor to be competent, and counsel replied in the affirmative, referring to the second competency assessment. The trial court's admonishments substantially complied with the

---

[10]*See also Vaughn v. State*, No. 14-08-00522-CR, 2009 WL 3294998 (Tex. App.—Houston [14th Dist.] Oct. 15, 2009, pet. dism'd) (mem. op., not designated for publication) (assuming arguendo counsel's failure to investigate was ineffective, mere speculation as to what a psychiatrist might have said was insufficient to prove prejudice) (we cite this case not as authority, but for its persuasive value).

requirements of Article 26.13 of the Texas Code of Criminal Procedure. TEX. CODE CRIM. PROC. ANN. art. 26.13 (Vernon Supp. 2009). Thus, a prima facie showing was made that Taylor's plea was entered knowingly and voluntarily. After such a prima facie showing, the burden shifted to Taylor to demonstrate that he did not fully understand the consequences of his plea and that he thereby suffered harm. *Martinez v. State*, 981 S.W.2d 195, 197 (Tex. Crim. App. 1998).

Taylor's claim that his plea was not made voluntarily is undermined by the fact that before he entered his guilty plea, he apparently discussed the insanity defense with the examining physician while at the state hospital. Based on Taylor's statements recited in the second competency evaluation, Taylor was familiar with the meanings of his different options: a plea of guilty; a plea of not guilty; a no contest plea; and a plea of not guilty by reason of insanity. He was able to discuss with the doctor various aspects of trial proceedings, including the Fifth Amendment's protection against compelled testimony. This rebuts Taylor's assertion that he was unaware of the possibility of an insanity defense.

The trial court explicitly found that Taylor's plea was made "freely and voluntarily" and that he was "mentally competent." As for the requirement an appellant must demonstrate he did not understand the consequences of his plea such that the appellant suffered harm, we refer to our discussion above regarding the dearth of evidence supporting an insanity defense in this case. Taylor has not met his burden of proving his plea was not voluntarily made; we overrule his second point of error and affirm the trial court's judgment and sentence.

14

Bailey C. Moseley
Justice

Date Submitted:      June 30, 2010
Date Decided:        July 16, 2010

Do Not Publish