Affirmed and Memorandum Opinion filed August 23, 2007








Affirmed and Memorandum Opinion filed August 23, 2007.

 

 

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-05-00921-CR

_______________

 

MARTHA BURKS, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

                                                                                                                                               


On Appeal from the 212th District Court

Galveston County, Texas

Trial Court Cause No. 03CR2734

                                                                                                                                                

 

M E M O R A N D U M   O P I N I O N

Appellant,
Martha Burks, was charged with aggravated assault after she stabbed her
five-year-old daughter.  A jury rejected appellant=s insanity defense, found her guilty,
and sentenced her to twenty years= confinement.  In appellant=s sole issue, she contends the
evidence is factually insufficient to support (1) the jury=s rejection of her insanity defense,
and (2) the jury=s finding that she possessed the requisite culpable mental
state.  Because all dispositive issues are clearly settled in law, we issue
this memorandum opinion and affirm.  See Tex. R. App. P. 47.4.








I.  Background

Appellant
does not dispute that she stabbed her five-year-old daughter, S.B., with a
knife on September 6, 2003.  It is also undisputed that appellant has a history
of mental illness.  Over the years, she has seen various professionals, been
hospitalized numerous times, and intermittently taken medication.

At the
time of the stabbing, appellant and David Burks had been married thirteen
years, had three children, and lived in Texas City.  David testified regarding
appellant=s mental problems and the incident at issue.  He first noticed appellant=s problems early in their marriage. 
For many years, she alternated between normal and irrational behavior.  From
2001 to 2003, appellant was hospitalized several times.  In February 2003, her
problems became more frequently manifested.  Appellant had recently returned to
Texas City after temporarily living with her mother in Louisiana.  She obtained
her own apartment, but David allowed her to visit the children, who had
remained with him.  However, a court ordered a ninety-day commitment after
appellant forcibly took S.B. and her twin brother from their babysitter.  Despite
David=s objection, appellant=s psychiatrist released her early,
and she returned to the family=s home in May 2003.

 Subsequently,
consistent with a recurring pattern, appellant quit taking her medication, and
her problems escalated.  She previously offered various excuses for her refusal
to take medication.  But, this time, she informed David that Avoices@ told her to quit taking it.  When
David insisted she take it, she claimed Jesus had healed her.  In late August
2003, she retrieved S.B.=s twin brother from school because the voices told her to go
to Dallas.  However, she turned around upon realizing she knew no one in
Dallas.








 In the
days leading up to September 5, 2003, appellant exhibited additional strange
and Amanic@ behaviors.  One evening, she
showered fully-clothed and then lay on the kitchen floor.  On one occasion, she
rolled in mud and excrement in the dog pen.  She also urged the children to
kick the dog.  At one point, David found appellant sitting on the toilet,
eating feces, and smearing it on her face because Athe voices@  told her to Aeat shit.@[1]  Appellant spent considerable time
reading her Bible and subsisted on cigarettes and coffee.  David estimated she
did not sleep for nine or ten days before the stabbing.

On
September 5, 2003, David took appellant to see her psychiatrist, Dr. George
Sloganhoff.  After appellant=s examination, David relayed his concerns to the doctor. 
David felt the doctor was dismissive towards appellant=s condition because the doctor did
not order hospitalization.  Appellant became irritated that David spoke with
the doctor and requested the keys to his truck, ostensibly to smoke a
cigarette.  However, she left in the truck.  David took a taxi home and found
appellant in the backyard staring at the sky.  That evening, she remained
incoherent and unresponsive to her family.  She mostly smoked cigarettes, drank
coffee, and read her Bible.  S.B. watched cartoons and colored.[2] 
David fell asleep while watching television in his bedroom.  

Shortly
after midnight, David was awakened by screaming, followed by S.B.=s cries.  He ran to the living room
where appellant was sitting on the couch, howling like a wolf, and holding a
steak knife.  He knocked the knife from her hand, cuffed her mouth, and asked
what she had done.  Appellant responded either, AWe have killed her. You can save her@ or AI have killed her.  Now you save her.@[3]  David ran to S.B.=s bedroom.  She lay on the floor and
was moaning, pale, bleeding, and entering a state of shock.  David summoned
emergency personnel and applied pressure to one of S.B.=s wounds.  In the meantime, appellant
had gone to the back yard, so David locked her out.  








Police
officers eventually transported appellant to the Texas City jail.  S.B.
sustained two stab wounds: to the back and chest.  She was hospitalized for
four days, but fully recovered with no recollection of the incident. A court
imposed a protective order precluding appellant from physical contact with the
children, who continued to  live with David.

After
appellant=s arrest, pursuant to the trial court=s orders, she was evaluated by two
psychiatrists relative to the insanity issue.  The doctors reported conflicting
opinions on whether appellant was legally insane when she stabbed S.B.  At
trial, the parties presented extensive evidence concerning appellant=s mental state at the time of the
incident, including the testimony of both doctors.  The jury was instructed
regarding the insanity defense and given the option to find appellant not
guilty by reason of insanity.  However, the jury found appellant guilty of
aggravated assault, thereby rejecting the insanity defense.

II.   Rejection of Insanity Defense

We will
first consider appellant=s contention that the evidence is factually insufficient to
support the jury=s rejection of her insanity defense.

A.        Standard of Review

A
defendant bears the burden to prove the affirmative defense of insanity by a
preponderance of the evidence.  See
Tex. Pen. Code Ann. ' 8.01(a) (Vernon Supp. 2006); Tex. Code Crim. Proc. Ann. art. 46C.153(a)(2) (Vernon 2006);  Reyna
v. State, 116 S.W.3d 362, 366 (Tex. App.CEl Paso 2003, no pet.) (citing Meraz
v. State, 785 S.W.2d 146, 150 (Tex. Crim. App. 1990)).  The essential
question is whether, at the time of the conduct charged, the defendant, as a
result of severe mental disease or defect, did not know her conduct was wrong.  Tex. Pen. Code Ann. ' 8.01(a); Reyna, 116 S.W.3d at
367; Plough v. State, 725 S.W.2d 494, 500 (Tex. App.CCorpus Christi 1987, no pet.).








The
insanity issue is not strictly medical but also invokes legal and ethical considerations. 
Bigby v. State, 892 S.W.2d 864, 877 (Tex. Crim. App. 1994) (citing Graham
v. State, 566 S.W.2d 941, 949 (Tex. Crim. App. 1978)); Reyna, 116
S.W.3d at 367.  Expert testimony may aid the jury in its determination of the
ultimate issue, but does not dictate the result.  See Graham, 566 S.W.2d
at 949; Reyna, 116 S.W.3d at 367.  Only the jury can join non‑medical
components that must be considered in deciding the ultimate issue.  Bigby,
892 S.W.2d at 878 (citing Graham, 566 S.W.2d at 949); Reyna, 116
S.W.3d at 367.  Because circumstances of a crime are always important in
determining the accused=s mental state at the time of the offense, the jury may
consider such evidence as her demeanor before and after the offense, attempts
to evade police, attempts to conceal incriminating evidence, expressions of
regret or fear of the consequences of her action, other possible motives for
the offense, and other explanations for her behavior.  See Graham,
566 S.W.2d at 951B52; Torres v. State, 976 S.W.2d 345, 347B48 (Tex. App.CCorpus Christi 1998, no pet.).

Ultimately,
determination of the insanity issue lies within the province of the jury, as to
credibility of witnesses and weight of the evidence, as well as the limits of
the defense.  See Bigby, 892 S.W.2d at 878 (citing Graham, 566
S.W.2d at 952); Reyna, 116 S.W.3d at 367.  In examining factual
sufficiency of the evidence to support a jury=s rejection of an insanity defense,
we review all the evidence relevant to the issue to determine whether the
judgment is so against the great weight and preponderance of the evidence that
it is manifestly unjust.  Bigby, 892 S.W.2d at 875 (citing Meraz,
785 S.W.2d at 155); Reyna, 116 S.W.3d at 367.  We will overturn the jury=s decision only when insanity is
undisputed or resolved to one end of the spectrum outside the realm of
discretion.  Reyna, 116 S.W.3d at 367 (citing Bigby, 892 S.W.2d
at 878).

B.        Expert Testimony








To
support her factual-insufficiency challenge, appellant primarily cites the
contrasting testimony of the experts who evaluated appellant.  As explained
below, both doctors agreed that appellant suffered from a severe mental disease
and heard voices which commanded her to slaughter S.B.  However, the doctors
disagreed regarding the appropriate diagnosis and whether appellant knew at the
time of the offense that stabbing S.B. was wrong.

1.         Dr. Michael Fuller

Appellant
presented testimony from Dr. Michael Fuller, an associate professor of
psychiatry at University of Texas Medical Branch in Galveston.  When appellant
requested pre-trial evaluation by a psychiatrist, the trial court appointed Dr.
Fuller.  He reviewed most of appellant=s medical records from previous
hospitalizations and met with appellant, her mother, and David.

In
October 2003, Dr. Fuller conducted four separate interviews of appellant,
lasting about one hour each.  During the first interview, she expressed guilt
and remorse about hurting S.B.  She recited a previous diagnosis of bipolar
disorder.  Dr. Fuller testified bipolar disorder causes a person=s emotional state to alternate
between severe depression and severe euphoric, delusional psychosis.  Appellant
said she experienced a severe episode of mania and heard voices for three or four
weeks before the stabbing and had not slept for many days. 

During a
subsequent visit, Dr. Fuller also recognized symptoms of a previously
undiagnosed Adissociative disorder,@ which occurs when one has learned as a child to mentally
separate from overwhelming trauma.  During a prior hospitalization as a
teenager, appellant  recalled she was raped at age seven or eight by her older
brother, and her mother beat her when she mentioned the rape.  Dr.  Fuller
found her recollection was credible.  Appellant, her mother, and David told him
that appellant had a history of sexual promiscuityCbehavior consistent with sexual abuse
as a child, bipolar disorder, and borderline personality disorder, which is
associated with a dissociative disorder.  Further, David reported appellant
once curled up in a ball saying, Amommy, don=t hit me@ after he yelled at herCan incident highly suggestive of
dissociative disorder.








Over the
course of the four interviews, Dr. Fuller obtained information from appellant
regarding the Avoices.@  During the first meeting, appellant reported the voices claimed her
torment would cease if she complied with their commands to stab S.B.  When Dr.
Fuller asked if S.B. was an intentional victim, appellant responded Ano, she was just there.@  Appellant was unable to clarify the
origin of the voices.

During
the second visit, appellant reported that the voices waged a battle between
good and evil within her, and she feverishly read the Bible to find answers to
these torments.  Several days before the stabbing, the voices told her she was Alower than dirt@ and instructed her to eat dirt and
feces.  Dr. Fuller believed appellant ate feces because David also mentioned
the incident.  Dr. Fuller testified that eating one=s own feces is caused exclusively by
profound psychosis or brain damage because that act is incomprehensible in
every culture.  Dr. Fuller described the last few minutes of this interview as Achilling.@  Appellant relayed that Satan told
her she is a star and must slaughter her children to resume her destiny in the
heavens.[4]

During
the third meeting, appellant assured Dr. Fuller she had literally been a star
in earthling form.  In the heavens, other stars denigrated her because they
were required to skin their children alive to resume their place in the heavens
while she was compelled to only sacrifice her child.  In addition, appellant
repeated psychotic statements involving Aclang like associations,@ such as Alame@ and Alamb@ and Ababy alone@ and ABabylon.@  She interjected that God created
her as a vessel to capture demons.








By the
last visit, appellant=s thoughts had changed into perceptions with a Christian
background.  She expressed she had been chosen by God, and the voices at the
time of the stabbing originated from God.  She again referenced her notion that
God used her as a vessel to store demons and prevent them from injuring other
people.

Dr. Fuller
ultimately concluded that, on the night appellant stabbed S.B., she was
extremely psychotic as a result of uncontrolled bipolar disorder, which had
driven her to absolute mental and physical exhaustion.  She believed the war
between good and evil transpired within her, and God commanded her to slaughter
S.B. to fulfill appellant=s destiny.  Until the moments surrounding the stabbing, she
had known right from wrong and resisted commands to harm her child.  However,
in the moments surrounding the stabbing, a combination of the severe psychotic
state and a dissociative episode separated her from the act she was commanded
to perform and she could not discern right from wrong.  In short, she Asnapped.@  Her howl after stabbing S.B. most
likely reflected an end to the dissociative state and realization of what she
had done.  Accordingly, Dr. Fuller opined that appellant was legally insane
when she stabbed S.B.

2.         Dr. Victor Scarano

The
State presented testimony from Dr. Victor Scarano, who is assistant professor
and chief of forensic psychiatry services at Baylor College of Medicine
Department of Psychiatry and also an attorney.  After Dr. Fuller rendered his
report, at the State=s request, the trial court appointed Dr. Scarano to evaluate
appellant.  Dr. Scarano met with appellant and reviewed some of her medical
records, a statement given by David, a police-department tape recorded at the
Burks= home, a videotape of appellant=s Abooking@ into the Texas City jail, a
recording of appellant=s transportation between the Texas City and Galveston County
jails, appellant=s letters to family members, and Dr. Fuller=s report.[5]








Dr.
Scarano testified that he evaluated appellant for four hours on November 24,
2003.[6]  Appellant
told Dr. Scarano about her previously Arecovered memory@ of sexual abuse as a young child by
her brother.  Dr. Scarano implied that he was skeptical of this claim based
primarily on the lack of corroboration.  Appellant told Dr. Scarano she did not
eat or sleep for a week before the stabbing and had eaten dirt and feces. 
However, Dr. Scarano doubted she ate feces for several reasons.  He found
inconsistencies in appellant=s and David=s recitations regarding this incident.[7] 
Moreover, Dr. Scarano explained that a person who would eat feces must be so Aterribly demented@ or Aabsolutely totally psychotic@ as to require hospitalization.  Such
person would be unable to function and could not drive a car, make coffee, act
guarded with a doctor to avoid hospitalization,[8]
or engage in lucid conversation just hours after stabbing her daughter[9]Cactions appellant performed around
the time she allegedly ate feces.

Dr.
Scarano and appellant also discussed the Avoices.@  She reported that evil voices said
she must kill her children to shine like a star.  She initially resisted,
knowing it was wrong to hurt her children.  However, she ultimately stabbed
S.B. in the abdomen and back and yelled, AI did it.  I did it.@  Appellant stated she was Acrushed@ because she knew this act was wrong.








Dr.
Scarano believed appellant heard voices.  However, he found inconsistencies in
appellant=s and David=s various statements regarding the time-frame for the
voices.  Further, he questioned appellant=s accounts to Dr. Fuller regarding
the source of the voices for several reasons: a psychotic person hears one
voiceCnot a morass of different voices;
voices are usually derogatory; ordinarily, the origin of voices does not change
from evil to God; and a voice from God does not command a person to commit an
act, such as kill her child, and promise a reward.  Moreover, appellant told
Dr. Scarano the voices were evil and specifically denied they originated from
God, as she had eventually relayed to Dr. Fuller.  Dr. Scarano suggested that
appellant changed her description to Dr. Fuller of the voices from evil to God
to help her insanity defense.  

Additionally,
Dr. Fuller had asked why appellant did not report such terrible commands to
David or her doctor before the stabbing.  She replied that they did not ask the
right questions.  Notably, several hours after the stabbing, appellant was
transported from the Texas City jail to the Galveston County jail and then
returned to the Texas City jail.  When Dr. Fuller asked why, she replied AI don=t know.  I guess I just didn=t give them the right answers to
their questions.@  Dr. Scarano testified that appellant=s twice making a similar statement
demonstrated an attempt at manipulationCnot florid psychosis.








Dr.
Scarano also testified concerning appellant=s use of the terms Alamb@ and ABabylon@ in her meetings with Dr. Fuller. 
Because appellant had focused on reading the New Testament book, Revelation,
Dr. Scarano looked for references to Babylon in that book.  Appellant=s statement that she was a vessel for
storing evil and her description of the war between the lamb and anti-Christ
mirrored two chapters of Revelation.  According to Dr. Scarano, these chapters
discuss Babylon as the repository of evil and predict a final battle between
the lamb and anti-Christ to remove this evil spirit.  Dr. Scarano suggested
that appellant obtained some descriptions of the voices from RevelationCnot from her mental state when she
stabbed S.B.[10]

Dr.
Scarano also explained the significance of the following items he reviewed:

Appellant=s Letters

On
November 1, 2003 (about two months after the stabbing), appellant wrote a
letter to her mother stating,

I=m all for divorcing David and getting one third of his
retirement.  I can=t wait to move into the cabin.  The Lord doesn=t want me with David this much.  He
has shown me.  I=m not worried one single bit.  I=ll be out of here before you know
it.  I=m thinking a few months and then
maybe the state school.

However, four days
letter, she wrote to David, stating she loved him and  was sorry for her
actions.[11]  According
to Dr. Scarano, the letters were indicative of a person trying to plan her
futureCnot a floridly psychotic or demented
person.

Tape
of Appellant=s Transportation Between Jails

Approximately
six hours after appellant stabbed S.B., Texas City police officer Earl
Mendenhoff transported her from the Texas City jail to the Galveston County
jail.  Dr. Scarano listened to a police-department tape of their conversation
during the ride.  He testified that appellant=s voice was calm and goal-directed,
her thought processes were goal-directed and  logical, and she gave appropriate
responses to questions.  She did not exhibit psychotic-type behavior or
symptoms of mania, such as pressured speech and hyperactivity.  In short, she
spoke in a Atotally normal manner.@








Jail Videotape 

Dr.
Scarano also viewed a videotape from the Texas City jail recorded shortly after
the stabbing.[12]  During
cross-examination, appellant focused on Dr. Scarano=s written report that no Abizarre behavior was noted@ on the tape, despite the following
actions:  appellant undressed and then put her clothes back on; she lay on the
floor when she heard an inmate scream in an adjacent cell; and she urinated and
defecated in the corner of her cell.  However, Dr. Scarano explained the
reasons for his notation.  When undressing, appellant kept her back to the
camera and thus consciously retained a degree of modesty.  Further, it is not
unusual for a person to become frightened upon hearing an inmate scream in an adjacent
cell.  Moreover, appellant had not relieved herself for a long time and was Avery careful@ to urinate and defecate in a
corner.  Then she moved her mattress to prevent urine from flowing onto it. 
Dr. Scarano opined appellant was already attempting to bolster her insanity
claim.








Dr.
Scarano ultimately concluded that appellant suffered a mental disease when she
stabbed S.B., but he could not clearly define the defect.  The voices may have
been caused by borderline personality disorder so manifest that she was
psychotic.  Alternatively, she may have been so depressed due to bipolar
disorder that she became psychotic.  Dr. Scarano disagreed that appellant was
in a manic state or experienced dissociation when she stabbed S.B.  However, he
concluded that, even if she experienced dissociation, she did not lose the
ability to discern right from wrong.  Dr. Scarano further disagreed with Dr.
Fuller=s suggestion that a person can enter
a state of legal insanity at the moment she commits a crime and then suddenly
return to a state of sanity.  Instead, Dr. Scarano opined the voices commanded
appellant to perform an act she knew was wrong, but she could not resist.  By
subsequently yelling AI did it,@ she effectively told the voices, Aall right, already, now leave me
alone.  I did do it.  I did it.@  Thus, the statement was consistent with awareness that
stabbing S.B. was wrong but inability to resist the command.  Consequently, Dr.
Scarano opined that appellant was not legally insane when she stabbed S.B.

C.        Analysis of Experts= Opinions

Appellant
contends the Aextraordinary contrast@ between the experts= analyses renders the evidence
factually insufficient to support the jury=s rejection of  her insanity
defense.  She argues that Dr. Fuller=s analysis was thorough and Adiligently researched@ while Dr. Scarano=s approach was cursory.  However,
after reviewing the testimony of both doctors, we cannot say that Dr. Scarano=s analysis was so cursory compared to
Dr. Fuller=s evaluation that the evidence is factually insufficient to support the
verdict.  Dr. Scarano explained the reasons for his opinion at length and
negated many of the factors relied on by Dr. Fuller.  Further, each party
thoroughly cross-examined the expert presented by the other party to ferret out
purported inadequacies in the doctors= respective opinions.

Appellant
emphasizes that Dr. Scarano reviewed relevant records after interviewing
appellant, did not review all her medical records, and failed to interview
David regarding purported inconsistencies in his accounts of appellant=s behavior, particularly the
feces-eating incident.  However, Dr. Scarano explained he prefers to conduct an
interview before reviewing records to prevent a Apre conditioned idea of what is going
on.@  Following the interview, he read a Atremendous@ number of records before rendering
his opinion.  Further, Dr. Scarano found that appellant=s statements after the stabbing were
more pertinent to her state of mind at the time of the offense than previous
medical records.  Dr. Scarano also testified he had sufficient information to
understand David=s position.  Moreover, because David  testified, the jury had
the opportunity to evaluate his credibility and decide whether to believe his
statements regarding appellant=s behavior.








In
addition, Dr. Scarano compared both doctors= qualifications and methodology.
Although Dr. Fuller regularly conducts forensic psychiatric evaluations, he is
not board-certified in forensic psychiatry, whereas Dr. Scarano is
board-certified in forensic psychiatry.[13] 
Dr. Scarano explained that doctors who are considered Aforensic psychiatrists@ are board-certified.  Also, Dr.
Fuller found that several examinations were necessary to obtain sufficient
information to render an opinion.  However,  Dr. Scarano preferred his method
of conducting one longer interview because an examinee becomes less guarded as
time progresses.  Further, at one meeting, Dr. Fuller discovered appellant had
been writing.  He encouraged her to continue writing and bring her notes to
their next visit.  Dr. Scarano was quite critical of this request because
appellant would be influenced to record thoughts helpful to her case.

 Appellant
also contends Dr. Scarano=s approach was Aadversarial@ and calculated to dismantle Dr.
Fuller=s opinion.  Appellant asserts Dr.
Scarano focused on cataloging inconsistencies in appellant=s reports regarding the voices. 
However, Dr. Scarano explained that a forensic psychiatrist should critique any
previous reports on the examinee as part of the overall evaluation.  He also
indicated that analyzing inconsistencies is an important aspect of a forensic
evaluation, particularly when the subject stands accused of a felony. 
Moreover, considering the voices were central to appellant=s insanity defense, the jury was
entitled to assign great weight to the inconsistencies.  Based on the
inconsistencies, the jury could rationally infer that appellant made some
statements to doctors to support her insanity defense.  Appellant further
claims Dr. Scarano=s refusal to acknowledge that appellant=s behavior at the jail was bizarre
undermines the credibility of his opinions.  Although Dr. Fuller characterized
her behavior as Aabsolutely abnormal,@ the jury was free to believe Dr.
Scarano=s explanation that appellant=s actions were deliberate.








D.        Other Evidence of Appellant=s Mental State

Although
appellant focuses on the contrasting expert opinions, the State presented other
evidence supporting the jury=s rejection of her insanity defense. 

1.         Dr. George Sloganhoff=s Testimony

Dr.
Sloganhoff testified that, during appellant=s appointment the day before the
stabbing, she was alert, oriented, and aware of her surroundings, although she
was very guarded and vague and apparently preferred to be elsewhere.  She
denied hearing voices and having suicidal or homicidal thoughts.  She did not
exhibit any behavior indicating hospitalization was required.[14] 
Dr. Sloganhoff agreed appellant may have tried to mask her symptoms to avoid
hospitalization.  Regardless, the jury could infer that she was sufficiently
mentally conscious to mask her symptoms.  Further, she was sufficiently cognizant
of her surroundings to request David=s keys and leave in his truck when
she became irritated he spoke with the doctor.

2.         Officer Felix Flores=s Testimony and Tape








Officer
Felix Flores, who initially responded to the call from the Burks= home, testified at trial.  An
audio-tape of his conversations at the home was also admitted.[15] 
Thus, the jury could evaluate firsthand appellant=s statements and demeanor shortly
after the stabbing.  After Officer Flores allowed emergency personnel into the
home, he focused on appellant, who was in the backyard pacing and talking to
herself.  When he opened the door, she said AI did it.@  The jury could reasonably conclude
appellant knew stabbing S.B. was wrong, considering she made this statement
immediately when confronted by a police officer.  Further, appellant was
sufficiently lucid to respond ANo, I don=t@ when Officer Flores asked if she had any knives.  In
addition, Officer Flores testified appellant understood his instructions to
come to the front of the house and get in the police car, although she was
unresponsive to his repeated questions regarding the incident.

3.         Officer Mendenhoff=s Testimony and Tape

 The
jury also heard the taped conversation between Officer Mendenhoff and appellant
approximately six hours after the stabbing, as well as the officer=s testimony.[16] 
Even without Dr. Scarano=s observations concerning the tape, the jury could reasonably
draw several conclusions from the conversation.  During the ride between jails,
Officer Mendenhoff asked if apellant was alright.  Appellant initially said Ayes,@ but then said Ano@ and volunteered, AWhat I did tonight was a bad,
horrible thing.@  This statement indicates she knew stabbing S.B. was wrong. 
Further, appellant inquired about S.B.=s condition, and Officer Mendenhoff
testified she seemed concerned about S.B. and remorseful about the incident. 
They also discussed whether appellant could obtain information about S.B.=s condition and other matters.  The
jury heard for itself that appellant engaged in lucid conversation several
hours after the stabbing.[17]  Finally,
Officer Mendenhoff testified appellant knew she was returned to the Texas City
jail due to improper documentation.  Thus, he contradicted appellant=s statement to Dr. Fuller that she
was returned to the jail because she answered questions incorrectly.








4.         Appellant=s Letters

The jury
could also draw several conclusions from appellant=s dramatically conflicting letters to
her mother and David.  Although Dr. Scarano testified the letters were
indicative of a person attempting to plan her future, the jury could reach that
conclusion on its own.  Moreover, based on the contrasting letters, the jury
could question the credibility of appellant=s statements to various witnesses,
including Dr. Fuller.  The jury could also view appellant as manipulative and
willing to make the statements necessary to obtain support during her
prosecution.

In sum,
the jury heard substantial evidence concerning whether appellant=s mental disease rendered her legally
insane when she stabbed S.B.  After reviewing all the evidence, we conclude the
jury=s rejection of appellant=s insanity defense is not so contrary
to the great weight and preponderance of the evidence that it is manifestly
unjust.

III.   Culpable Mental State

Appellant
also contends the evidence is factually insufficient to support the jury=s finding that she possessed the
requisite culpable mental state. 

A.        Standard of Review 








Appellant
was charged with committing aggravated assault by intentionally, knowingly, or
recklessly causing bodily injury to S.B. by stabbing or cutting her with a
deadly weaponCa knife.  See Tex. Pen.
Code Ann. '' 22.01(a)(1); 22.02(a)(2) (Vernon Supp. 2006).  Assault by
causing bodily injury under Penal Code section 22.01(a)(1) is a result-oriented
offense.  Ford v. State, 38 S.W.3d 836, 844 (Tex. App.CHouston [14th Dist.] 2001, pet. ref=d).  Therefore, the State must prove
the defendant caused the result with the requisite culpable mental state.  See
id. (citing Cook v. State, 884 S.W.2d 485, 490 (Tex. Crim. App.
1994)).  AA person acts intentionally, or with intent, with respect to . . . a
result of [her] conduct when it is [her] conscious objective or desire to . . .
cause the result.@  Tex. Pen. Code Ann.
' 6.03(a) (Vernon 2003).  AA person acts knowingly, or with
knowledge, with respect to a result of [her] conduct when [she] is aware that
[her] conduct is reasonably certain to cause the result.@  Tex.
Pen. Code Ann. ' 6.03 (b) (Vernon 2003).[18]  A culpable
mental state may be inferred from circumstantial evidence such as acts, words,
and conduct of the defendant and surrounding circumstances.  See Guevara
v. State, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); see Stadt v. State,
120 S.W.3d 428, 438 (Tex. App.CHouston [14th Dist.] 2003), aff=d, 182 S.W.3d 360 (Tex. Crim. App. 2005).

 Appellant=s specific complaint is that her
mental illness diminished her capacity to form a culpable mental state.  Under
Texas law, diminished capacity is not recognized as an affirmative defense;
i.e., a lesser form of the insanity defense. Jackson v. State, 160
S.W.3d 568, 573 (Tex. Crim. App. 2005).  However, diminished capacity is
recognized as a simple failure‑of‑proof defense in which the
defendant claims the State failed to prove she had the required state of mind
at the time of the offense.  Id.  A defendant may present evidence,
including her history of mental illness, to negate the mens rea element.  See
id. at 574. 

In this
sub-issue, as opposed to the insanity defense, appellant challenges factual
sufficiency of the evidence to support an element of the offense on which the
State bore the burden of proof.  We must view all the evidence in a neutral
light and set aside the verdict Aonly if it is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust.@ Cain v. State, 958 S.W.2d
404, 407 (Tex. Crim. App. 1997) (quoting Clewis v. State, 922 S.W.2d
126, 129 (Tex. Crim. App. 1996)).  Before we may reverse for factual
insufficiency, we must first be able to say, with some objective basis in the
record, that the great weight and preponderance of the evidence contradicts the
jury=s verdict.  Watson v. State,
204 S.W.3d 404, 417 (Tex. Crim. App. 2006).








B.        Analysis

Appellant
relies on the same evidence to support this sub-issue that she cites relative
to her insanity defense.  She contends that, even if she failed to prove legal
insanity, her diminished capacity precluded her ability to form a culpable
mental state.  We disagree.  

We have
outlined Dr. Scarano=s testimony and other evidence showing appellant=s actions, statements, and demeanor
around the time of the stabbing.  Based on this evidence, the jury could
rationally infer that, despite her mental disease, appellant was sufficiently
mentally conscious to form the intent to injure S.B.  Alternatively, the jury
could rationally infer, at least, that appellant was sufficiently aware that
stabbing S.B. would cause bodily injury.  In addition, the jury could
rationally infer appellant intended to, or was aware she would, injure S.B.
because she stated AWe have killed her@ or AI have killed her@ immediately after the stabbing. 
Nonetheless, appellant argues that this circumstantial evidence, which might
ordinarily establish a culpable mental state, is inapplicable because she
experienced dissociation at the moment she stabbed S.B.  She argues the
dissociative episode severed her ability to form a culpable mental state. 
However, for the reasons we have discussed, the jury was free to believe Dr.
Scarano=s opinion that appellant did not
experience dissociation when she stabbed S.B.








Moreover,
all the evidence, including Dr. Fuller=s testimony, indicates appellant=s mental disease actually provided
the culpable mental state.  For example, in Jackson, the defendant
killed his brother following a fight.  160 S.W.3d at 569B70.  The defendant presented evidence
he suffered from paranoid schizophrenia and bipolar disorder.  See id.
at 570B71.  The court considered whether
evidence of a defendant=s mental illness may be used to show that his diminished
capacity prevented ability to form a culpable mental state.  See id.
at 572B75.  However, before addressing that
issue, the court noted the evidence of mental illness in the case under review
did not negate mens rea.  Id. at 572.  Rather, the evidence of mental
illness demonstrated the defendant intended to cause serious bodily injury or
death.  Id.  Specifically, the defendant killed his brother because his
paranoia caused him to believe his brother was Aout to get him.@  Id.  Therefore, the paranoia
simply provided a motive for the intentional act.  Id.

Similarly,
in this case, the evidence of appellant=s mental illness demonstrated that
appellant intentionally or knowingly caused bodily injury to S.B.  Dr. Fuller
and Dr. Scarano both agreed that appellant heard voices commanding her to
slaughter S.B. to resume her place in the heavens.  According to Dr. Fuller,
based on her dissociative state, appellant lost the ability to discern right
from wrong at the moment she stabbed S.B.  Whether appellant knew it was wrong
to stab S.B., i.e. whether she was legally insane, was another question. 
Nevertheless, she acted on the commands and attempted to slaughter S.B. 
Therefore, her mental illnessCthe condition that caused her to hear voicesCprovided the motive to stab S.B. 
Accordingly, the jury=s finding that appellant possessed the requisite culpable
mental state is not contradicted by the great weight and preponderance of the
evidence.[19]

We overrule
appellant=s sole issue and affirm the judgment of the trial court.

 

 

/s/        Charles W. Seymore

Justice

 

Judgment rendered and Memorandum
Opinion filed August 23, 2007.

Panel consists of Justices Frost,
Seymore, and Guzman.

Do Not Publish C Tex.
R. App. P. 47.2(b).









[1]  As we will later discuss, one expert doubted that
appellant ate feces. 





[2]   The couple=s
oldest child was not home, and S.B.=s
twin brother went to bed early.  





[3]  David testified appellant responded, AWe have killed her. You can save her.@ However, within an hour and a half after the
incident, David twice told police officers appellant responded, AI have killed her.  Now you save her.@





[4]  Specifically, appellant stated, AI feel that I=m a
conqueror for Christ.  Those with spirit will suffer.  They are testing me. 
They tell me I=m of satan, that I=m
the bride of Christ.  Do you really want to know what I was thinking?  I had to
slaughter my children to resume my destiny.  My destiny is a star.  Female
stars come to earth and give birth.  In order to return to the heavens and
shine brightly once more they must sacrifice their children.  Satan tells me I=m one of them.@ 





[5]  Dr. Scarano also reviewed records from Children=s Protective Services, but they were not admitted at
trial, and Dr. Scarano did not testify regarding the contents.





[6]  Appellant contends jail records for this day
indicated the examination did not last four hours.  An entry shows appellant
was checked out of her cell at A800@ and returned to her cell at A1040.@  However, the
records do not indicate whether A1040@ meant a.m. or p.m.  The custodian of records
testified that A1040@ did not
necessarily mean a.m., and it was impossible to determine whether appellant was
logged in at 10:40 a.m. or p.m.  The custodian agreed she could have been
returned to the jail after her evaluation, but not placed in her cell until
later that evening.  Accordingly, no evidence conclusively negated Dr. Scarano=s claim he evaluated appellant for four hours, and the
jury was free to believe that testimony.





[7]  Although Dr. Scarano=s testimony was not exactly clear, apparently, most of the
inconsistencies concerned whether she first ate feces or dirt.





[8]  Dr. Scarano had learned  that appellant acted
guarded, presumably to avoid hospitalization, in her visit with Dr. Sloganhoff
the day before the offense.





[9]  As we will explain, Dr. Scarano reviewed a police
tape indicating appellant engaged in lucid conversation with an officer about
six hours after the stabbing.





[10]  Although Dr. Scarano=s testimony is not exactly clear, he stated, AThat was the essence of what she was talking about
when she says Revelations [sic] and talks about Babylon and the lamb, not about
her daughter as she told, ask Dr. Fuller what she was talking about, but you
have to go and read it.@





[11]  These letters were not admitted at trial, but Dr.
Scarano relayed the content.





[12]  The tape was not admitted at trial; it could no
longer be watched due to some change in the recording system.  However, Dr.
Scarano was questioned about the tape based on the notes in his report.





[13]  Both doctors explained that forensic psychiatry
concerns the interface between psychiatric conditions and legal matters,
including criminal responsibility.  





[14]  In contrast, appellant presented testimony from
Catherine Jones, an administrative staff member at the clinic.  She testified
appellant seemed unaware of her surroundings at her appointment.  However, the
jury was free to believe Dr. Sloganhoff=s
testimony regarding appellant=s demeanor.  





[15]  Officers=
activities and conversations at the home were taped by equipment in the police
car.  The  video portion of the tape contains no images pertinent to our
review.





[16]  On the tape, Officer Mendenhoff=s statements are not discernible, although appellant=s statements are clear.  However, he testified
regarding the substance of the conversation.





[17]  At one point, in response to appellant=s request, Officer Mendenhoff replied that  appellant 
could not talk to S.B.=s doctors about S.B.=s condition.  Appellant then stated, AAnd, I=m sure you don=t
care whether or not I know.@ At another
point, she stated, AYou just know what I did.@  These statements sounded not only lucid, but
confrontational. 





[18]  Because we conclude the evidence is factually
sufficient to support a finding that appellant acted Aintentionally@ or
Aknowingly,@ we
need not discuss the definition of Arecklessly.@ 





[19]  Appellant also cites a note from the jury to the
trial court asking whether a defendant found not guilty by reason of insanity
may Aautomatically resume a >normal= life without any court supervision or otherwise what
may happen after the verdict.@  According to
appellant, this question indicates at least one juror considered matters
outside the evidence to reach the verdict.  However, the jury sent the note
while the parties were presenting evidenceCnot
during deliberations.  Subsequently, the trial court instructed the jury to
consider only the evidence.  Absent indication to the contrary, we will presume
the jury followed the trial court=s
instructions.