NUMBER 13-05-148-CR 



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


CARLOS LOPEZ, Appellant,


v.



THE STATE OF TEXAS, Appellee.

 


On appeal from the 28th District Court 

of Nueces County, Texas

 


MEMORANDUM OPINION


Before Justices Yañez, Rodriguez, and Garza


Memorandum Opinion by Justice Rodriguez



 In July 1992, appellant, Carlos Lopez, was indicted for the capital murder of two
individuals by stabbing each with a knife during the same criminal transaction. See Tex.
Penal Code Ann. § 19.03(a)(7) (Vernon Supp. 2006). (1) Approximately one year later, a jury
returned a verdict that appellant was incompetent to stand trial. The jury also found that
there was a substantial probability that appellant would attain competency to stand trial
within the foreseeable future. In August 2004, a determination was made that appellant
had regained competency to stand trial.

 On November 30, 2004, trial began. Appellant raised the affirmative defense of
insanity. On December 8, 2004, the jury returned a verdict of guilty, rejecting appellant's
insanity defense. The trial court sentenced appellant to life imprisonment in the
Institutional Division of the Texas Department of Criminal Justice. See id. § 12.31 (Vernon
Supp. 2006). Appellant's motion for new trial was denied, and this appeal ensued. By one
issue, appellant contends the jury's rejection of the insanity defense was against the great
weight and preponderance of the evidence. We reverse and remand.

I. Background

 On July 1, 1992, appellant entered Room 109 at Riverside Hospital, (2) where two
elderly patients, Mrs. Estefana Munoz and Mrs. Mary Kocurek, were rehabilitating from
recent surgeries. Mrs. Munoz was a family friend, (3) Mrs. Kocurek, her roommate. As Debra
Muncell Flynn, an employee of the hospital, was leaving Room 109, she saw appellant stab
Mrs. Munoz multiple times. Appellant also stabbed Mrs. Kocurek. He walked out of the
room, down the hall, and into a restroom. When appellant came out of the restroom, a
maintenance-security guard apprehended him.

II. Factual Sufficiency Review of Insanity Defense

 By his sole issue, appellant contends that the evidence is factually insufficient to
support his conviction--that the jury's rejection of the insanity defense was against the
great weight and preponderance of the evidence as to be manifestly unjust.

A. Standard of Review and Applicable Law

 On appeal, when the defendant challenges the factual sufficiency of the evidence
to support the jury's rejection of his affirmative defense of insanity, an appellate court
considers all the evidence relevant to appellant's affirmative defense of insanity to
determine whether the judgment is so against the great weight and preponderance of the
evidence as to be manifestly unjust. Bigby v. State, 892 S.W.2d 864, 875 (Tex. Crim. App.
1994) (en banc); Meraz v. State, 785 S.W.2d 146, 155 (Tex. Crim. App. 1990) (en banc);
Reyna v. State, 116 S.W.3d 362, 367 (Tex. App.-El Paso 2003, no pet.); Mitten v. State,
79 S.W.3d 751, 757 (Tex. App.-Corpus Christi 2002) (en banc), rev'd on other grounds,
145 S.W.3d 225 (Tex. Crim. App. 2004). We overturn the jury's decision only when
insanity is undisputed or resolved to one end of the spectrum outside the realm of
discretion. Reyna, 116 S.W.3d at 367 (citing Bigby, 892 S.W.2d at 878).

 Insanity is an affirmative defense. See Tex. Penal Code Ann. § 8.01(a) (Vernon 
2003). Section 8.01(a) provides that "[i]t is an affirmative defense to prosecution that, at
the time of the conduct charged, the actor, as a result of severe mental disease or defect,
did not know that his conduct was wrong." Id. The question is whether at the time of the
conduct charged, the defendant, as a result of severe mental disease or defect, did not
know the conduct was wrong or illegal. Mendenhall v. State, 77 S.W.3d 815, 817-18 (Tex.
Crim. App. 2002); Reyna, 116 S.W.3d at 367. "The purpose of the insanity defense issue
is to determine whether the accused should be held responsible for the crime, or whether
his mental condition will excuse holding him responsible." Graham v. State, 566 S.W.2d
941, 948 (Tex. Crim. App. 1978) (en banc). At trial, the defendant has both the burden of
production of evidence and the burden of persuasion to prove all elements of the insanity
defense by a preponderance of the evidence. Id. at 875; Meraz, 785 S.W.2d at 150;
Reyna, 116 S.W.3d at 366-67; see Tex. Penal Code Ann. § 2.04(d) (Vernon 2003).

 In this case, there is no disagreement that the evidence established that appellant
was suffering from a severe mental defect or disease at the time of the offense. Thus, the
first element of the insanity defense is satisfied. See Tex. Penal Code Ann. § 8.01(a)
(Vernon 2003). We will, therefore, review only the second element of the
defense--whether appellant knew his conduct was wrong or illegal. See id.; Bigby, 892
S.W.2d at 878. Knowledge that conduct is "wrong" does not depend upon the defendant's
own personal moral code, but is judged by whether the defendant understood that others
believed his conduct was wrong or knew that his action was "illegal" by societal standards. 
See Bigby, 892 S.W.2d at 878.

 "Expert testimony on the issue of appellant's ability to determine right from wrong
does not establish insanity as a matter of law." Torres v. State, 976 S.W.2d 345, 347-48
(Tex. App.-Corpus Christi 1998, no pet.) (en banc). While expert testimony may aid the
jury in its determination of the ultimate issue, it does not dictate the result. See Graham,
566 S.W.2d at 949; Reyna, 116 S.W.3d at 367; Torres, 976 S.W.2d at 347 ("[T]he issue
of insanity is outside the purview of medical experts and should be left to the discretion of
the trier of fact."). When circumstances suggest otherwise, a jury may accept or reject, in
whole or in part, an expert's opinion that the defendant was insane and may even accept
lay testimony over that of experts. See Graham, 566 S.W.2d at 962; Mitten, 79 S.W.3d
at 758-59. Because circumstances of a crime are always important in determining the
accused's mental state--whether he knew his conduct was wrong or illegal at the time of
the offense--the jury may consider such evidence as: his demeanor before and after the
offense; attempts to elude police; attempts to conceal incriminating evidence, expressions
of regret, fear, or a knowledge of the serious consequences of his action; other possible
motives for committing the offense; and other explanations for his behavior. See Graham,
566 S.W.2d at 951-52; Reyna, 116 S.W.3d at 368; Mitten, 79 S.W.3d at 758-59; Torres,
976 S.W.2d at 347-48. Ultimately, determination of the insanity issue lies within the
province of the jury, as to credibility of witnesses and weight of the evidence, as well as the
limits of the defense. See Bigby, 892 S.W.2d at 878 (citing Graham, 566 S.W.2d at 952);
Reyna, 116 S.W.3d at 367.

B. Evidence Relevant to Whether Appellant Knew 

His Conduct Was Wrong or Illegal


 Appellant's mother, Ascencion Martinez Lopez, testified that in the days and weeks
prior to July 1, 1992, appellant had been very upset and very anxious and was acting very
strange. He woke up and said that it wasn't his house, the shirt he put on was buttoned
up wrong, and he put on one brown boot and one black boot. Appellant said that he was
God, the Messiah. Appellant also told Mrs. Lopez that Mary Lou Wyatt and Mrs. Munoz
had put a curse on him. Mrs. Lopez remembered appellant talking about witchcraft and
saying that the world was full of witchcraft and that he needed to do something about the
witches in the world. A few days before the stabbings, appellant and his mother had visited
Mrs. Munoz at the hospital.

 Nila Martinez Lopez, appellant's aunt, testified that two weeks before the killings,
appellant told her that Wyatt, one of the victim's granddaughters, had put a curse on him. 
She testified that through the years, appellant appeared to be "fixated" on Wyatt.

 Harry Rucker, appellant's friend, testified that he noticed appellant was changing,
that he was talking about voodoo and hexes. On the evening of his arrest, appellant called
Rucker from the jail and said he did not kill those people, that "[v]oodoo did." A few
months later, appellant called him again and told him about "the voodoo and stuff." Rucker
did not feel like appellant was in his right mind; testified he had seen appellant decline
throughout, for a long time.

 Victor C. Ramos, who is related to both appellant's family and the victim's family,
and who also worked with appellant from 1979 to 1986, testified that in mid-June 1992, he
saw appellant when he walked into a bar. Appellant told him that he was President of the
United States, that he owned the whole world, and that he was Ross Perot. Appellant went
on to say that he was God and that Wade, Wyatt's son, was Jesus. Ramos testified that
these statements did not concern him and that other people were talking about appellant
and the statements he made. Appellant also told Ramos that Mary Lou (Wyatt), Richard,
Mary Lou's older brother, and Maria, their mother, "put a spell on him," that "they were
going to pay for what they did to him," and that "he decided what kind of punishment they
got." These statements caused him to become alarmed because he felt he knew what was
going through appellant's mind. He did not, however, call the police with his concerns.

 Lori Baily, a legal assistant for the law firm Stone, Stone and Horne, testified that
she met appellant when Hubert Stone was representing appellant on a variety of claims. 
Appellant came into the law office two days before the incident to fill out paperwork for a
social security claim. As Bailey was assisting him in filling out the paperwork, appellant
kept insisting that his name was Ross Perot and would not answer her questions regarding
the information needed for the forms. She also testified that, shortly before the incident,
Stone went with appellant to the home of a woman Stone described as a witch, who
appellant said was telling him what he should do with settlement money he was to receive
from an automobile accident.

 Rebecca Sue Boone, a bartender at the Frontier Saloon, testified that she saw
appellant the evening before the incident. She walked into the bar, and everybody was
complaining that appellant was acting weird. Boone went over to appellant, who said he
was going to be the next President of the United States and "fixing to get - run into all
these millions of dollars. . . . He was just not Carlos Lopez, period. . . . He was a total
stranger." Appellant also mentioned that he was Ross Perot and God. In her opinion,
appellant was having mental problems.

 Appellant's mother testified that on the morning of July 1, 1992, appellant acted
strangely. Appellant told her he was going to a dentist, claiming he had an appointment
which she knew he did not have; appellant proceeded to the dental office. Mrs. Lopez
called Mental Health and Mental Retardation (MHMR) that morning because she knew
appellant needed help. (4)

 Barbara Huett was employed as a receptionist and appointment secretary at the
dental office of Robert Cody, D.D.S., located next to the Riverside Hospital medical
complex. She testified that a little before 10:00 a.m. on July 1, 1992, appellant came into
the office without an appointment; he was not even Dr. Cody's patient. (5) When she asked
him to wait a moment, appellant said, "What's 64 minus?" (6) He also said, "Someone's
going to get hurt," and later said, "Someone is going to get fired." Huett described
appellant's behavior as schizophrenic; abnormal. He was not engaging in conversation;
he was just telling her something. He also asked what Huett's name was, and when she
told him "B.J." he said, "Well, I'm Dr. C.J." After being told that he had no appointment, but
that she would be glad to make one for him, he looked at her, smiled, turned around, and
walked out the door. She agreed that appellant did not seem to be in his right mind; that
he was laboring under a mental illness--he would talk to her one minute apparently very
agitated and the next minute would appear to be very calm, smiling, and at ease.

 On July 1, 1992, Patricia Uresti was employed at Mercantile Bank in the new
accounts and customer service department. Around 10:00 a.m. that morning, appellant
came into the bank to withdraw money, but his account had been closed for over a year. 
Appellant told her that he was the owner of the bank and did not need any identification to
prove who he was. When told his account had been closed, he said he would go home
and get more identification or information. Appellant thanked her and left. She noticed
nothing unusual about his demeanor.

 On July 1, 1992, the day of the incident, Riverside Hospital was having problems
with its air conditioning system. The rooms were hot, and the employees, including Flynn,
were distributing fans to the rooms. Flynn entered Room 109 and saw appellant visiting
with the two women patients. While installing the fan in the room, she noticed that Mrs.
Munoz signaled appellant to come closer to her. Mrs. Munoz asked appellant, in Spanish,
to ask why the room was so hot. Appellant approached Flynn and asked why the air
conditioning system was down. Flynn noticed that as appellant questioned her, he made
a tight fist at his side and commented, "you could die in this heat." This did not alert her,
in any way, that she might be harmed, because she had heard people say that before in
South Texas. Flynn explained that efforts were being made to correct the problem with the
air conditioning system. She also noticed that Mrs. Munoz signaled her not to worry, that
they were not bothered by the heat and were willing to wait for the air conditioning to be
repaired. Flynn talked to the patients and started to exit the room. As she walked by
appellant, she noticed that he had a very "thoughtful look on his face," like he was thinking
about something. Appellant seemed okay, like he was just there visiting. Flynn never
perceived that he acted strange, assertive, or unusual. As Flynn stepped into the hallway,
she turned around and saw appellant approach the women with a knife in his hand. The
women had their hands up in the air. Flynn saw appellant start to stab something white
between the women, possibly a pillow. Appellant stabbed Mrs. Munoz multiple times. (7) 
Flynn left the room and sought help. She did not see appellant stab Mrs. Kocurek. (8)

 Flynn testified that when security arrived, she saw appellant coming down the
hallway "sort of walking like, just leave me alone, get out of my way, kind of staggering, .
. . talking to [people] . . . his attitude was just like, just leave me alone, just get out of my
way, just go away." He had the knife in his hand, but didn't attempt to stab anyone in the
hallway. "He seemed irritated; just get out of my way, just leave me alone, that kind of a
gesture." Flynn explained that appellant "didn't seem like he didn't know what was going
around--seemed in control." In her statement signed on July 1, 1992, Flynn stated that
"he seems confused," although at trial, she stated she used the word "irritated" to describe
his behavior, rather than confused. Flynn sensed that appellant had done what he had
come to do and did not intend to hurt anybody else. Walking down the hallway, he did not
attempt to hurt anyone else.

 Others, including two physical therapists who had just left Room 109 and saw a man
enter it, heard screaming. When the screaming stopped, they saw appellant exit Room
109 holding a knife. He had blood on his arm. Appellant said repeatedly that "he killed
them because they were witches." One of the therapists testified that when exiting Room
109, appellant looked in his direction, then turned and went the other way.

 Eloisa Leza, a licensed, vocational nurse employed by Riverside Hospital, testified
that she heard Flynn running down the hallway screaming, "He's going crazy in there." She
heard screaming coming from Room 109 and ran toward the room. As she passed the
entrance of the room, Leza saw a man wearing dark glasses holding a knife, pacing. She
caught his attention when she entered the room, and he said, "If you want to see witches,
I will show you witches." His comment did not make any sense to her. She couldn't say
that she thought he was going crazy, but she stated that "[i]t was not a logical thing that he
was saying, there were no witches in there."

 Leza testified that as she backed out of the room, she thought appellant was going
to kill her. He was pacing back and forth--maybe following her--swinging his arms and
saying in a very angry tone, "[Y]ou want to see witches, I will show you witches. Come in
here and I'll show you witches." From the room across the hall, Leza saw appellant come
out of Room 109 after the screaming had stopped. With the knife in his hand, appellant
walked away from the room; he walked very naturally and did not run and did not seem
angry. The knife was in plain view. Appellant made no attempt to dispose of the knife.

 Shelly Kimbrue testified that while she was having a medical test done at the
hospital, she heard screaming. A few minutes later, she saw a man in the middle of the
hallway with a bloody knife in his hand. He stopped, turned, and threatened someone
coming behind him. She stated that appellant said if they got any closer that they would
get the same. (9) To Kimbrue, it seemed like appellant was mad. Kimbrue, who was seven
months pregnant at the time, ducked beside a wall phone and held her purse in front of
her, hoping appellant wouldn't see her or wouldn't care. Without looking her way, appellant
walked right by Kimbrue and into the bathroom.

 Charlotte Nolan, a nurse at the hospital, testified that she heard screaming and went
to Room 109 to find out what was wrong. She saw a man in the room stabbing Mrs.
Munoz and then saw him slit her throat. When the man heard Nolan, he turned around,
looked at her and moved toward her. Nolan testified that,

 When I would back up, he would come with me. And then I would back up,
and he would come with me. And then at that point where I backed up and
I was almost in the doorway where the door was open, and I was standing
here and he was here, and Mrs. Kocurek was right here. So then he just
turned and went after her.


 Although not in her statement to the police, at trial, Nolan testified that after
appellant had stabbed the women, she returned to the room and asked him to put the knife
away. Appellant was coming across the hall and wailing his arms and saying, "I'm
powerful. I am great. Look what I have done." After she again asked him to put the knife
down and go away, all of a sudden he looked at her and responded, "Oh, yeah, sure," and
then walked off down the hall. Appellant acted like he really did not know why she was
asking him to put down his knife and go away.

 Luis Alberto Vasquez, who worked in maintenance and security at Riverside
Hospital in 1992, testified he did not follow appellant from the rehabilitation wing, but
rather, first saw appellant in front of the nurses' station and then in the middle of the
hallway, walking and brandishing his hands (arms going up and down) and holding the
knife with the blade open. Appellant appeared nervous-shaking, but not yelling or
screaming. His hand was full of blood, blood dripping down on the floor. At first, Vasquez
observed appellant as not being in his right mind. He believed that appellant's behavior
was not that of a person who was acting and thinking rationally.

 Vasquez talked to appellant. Appellant did not say any threatening words to
Vasquez and did not wave the knife at him. Vasquez did not see appellant threaten
anybody with the knife. Up until the time he was handcuffed, appellant only spoke in
Spanish. Appellant kept saying, "las mate por que eran brujas," which translates to "he
killed them because they were witches. Appellant repeated, in Spanish, "brujeria, I killed
them because of brujeria." He seemed fixated on that issue. Vasquez also testified that
appellant's conversation about witches seemed irrational. He never heard appellant utter
the words, "I'm sorry," in either English or Spanish. When appellant started coming toward
him, Vasquez backed up, but appellant took a left into a restroom off of a small, little
hallway. (10)

 Approximately five minutes later, appellant exited the men's restroom. His hands
were clean and the knife, with the blade closed, was in his hand. Appellant offered no
resistance. Vasquez told appellant to get up against the wall, and when he attempted to
cuff his hand behind his back, appellant said, in English, not to cuff him behind his back
because he had back surgery. (11) Vasquez raised up appellant's shirt and found an eight-inch scar on appellant's back, so Vasquez cuffed him in front. Appellant had a good grip
on the knife, but when Vasquez squeezed his hand, appellant let it go. Vasquez identified
appellant as the man with the knife. Appellant made no attempt to dispose of the knife in
his presence. Vasquez described appellant's demeanor as calm, not even angry. Before
he entered the bathroom, they were talking about the witches. Vasquez testified that
appellant "looked normal just saying that he killed them because they were witches." 
When he came out of the restroom, his demeanor was normal, calm. He made no attempt
to flee. According to Vasquez, Raul Bernal, director of hospital maintenance/security at
that time, watched from a distance and approached Vasquez and appellant after appellant
was handcuffed. Both men escorted appellant out of the lobby area. At this time,
appellant was fairly passive, not combative, not argumentative. Vasquez had no difficulty
restraining him. Appellant let Vasquez cuff him and walked calmly with them when he was
turned over to the police department without incident.

 Raul Bernal testified, however, that he and Vasquez confronted appellant as
appellant came out of the bathroom. Bernal testified that he heard appellant say, in
Spanish, "[B]rujeria [witchcraft]. I'm sorry. I'm sorry." Excerpts from Bernal's deposition
testimony were read into the record at trial. At his deposition, Bernal testified that appellant
said, in Spanish, "brujeria, no vuelvas" and "me duele la espalda," which, according to
defense counsel, translates to "witchcraft, don't hurt me. My back hurts." When asked,
Bernal did not know how to say "I'm sorry," in Spanish. This line of questioning suggests
that appellant said something else, which Bernal may have translated to include "I'm sorry." 
Finally, in contrast to Vasquez's testimony, Bernal testified that he saw Vasquez take the
folded knife out of appellant's pocket.

 Tyrone W. Looper was the first police officer on the scene. He saw appellant
handcuffed and with blood on his hands. Officer Looper described appellant's demeanor
as "real passive," "no problem," and "real quiet." Appellant told him, "I did it" and muttered
something in English about witchcraft--about a grandmother or a curse--that someone
had put a curse on him.

 Corpus Christi Police Officer Richard Carl Stacey transported appellant to the
station. Officer Stacey testified that he was with appellant for a matter of hours and
described appellant as "calm, very matter-of-factly [sic], conversive, no problems
whatsoever." There was nothing out of the ordinary or unusual about appellant's behavior
during the time he had an opportunity to observe and speak with him. On cross-examination, Officer Stacey agreed, as a lay person, that mental illness or psychosis does
not have to be apparent 100 percent of the time, and that it was possible that an hour
earlier, he might have had a different view of what happened.

 Municipal Court Judge Rodolfo G. Tamez testified that he met with appellant on July
1, 1992, and conversed with him for about ten to fifteen minutes. He said that appellant
seemed calm, and he did not notice anything unusual about him. Nothing alerted him to
the possibility that appellant was dangerous or threatening in any way. On cross-examination, Judge Tamez agreed that, based on his brief observation of appellant, he
could not say that appellant was not suffering from severe mental disease or defect.

 Sergeant R. L. Garcia, the case agent on this case, testified, through recorded
testimony, that he was with appellant for at least three hours. Sergeant Garcia described
appellant as alert, calm and cooperative. He thought appellant was in his right mind at the
time of the interview. However, during the interview appellant talked to an imaginary
person. Sergeant Garcia said, "It was something at that point that was not real." When
asked by the prosecution whether he believed that appellant was in his right mind,
Sergeant Garcia responded, "Yes."

 Fred Flores, custodian of records for the Nueces County Sheriff's Department, read
from reports generated at the Nueces County Jail regarding appellant. These reports
documented appellant's behavior in the jail following the incident. An inmate classification
profile form, filled out on July 2, 1992, remarked the following:

 Current emotional status stable. Inmate is oriented . . . During interview
inmate displayed paranoia and delusional ideation specifically referring to
incident where he had been hexed by witchcraft, poisoned by chemicals from
a power plant and created by people who have . . . taken all his money. 
Inmate appears mentally unstable, should be considered potentially violent
and aggressive. Did not express any suicidal self injuries, addictions.

 According to another July 2, 1992 report, wrist restraints were put on appellant, and
he was placed on ten-minute watch when he said, "I hear my calling. I must crucify myself
and to the other inmates and myself." He was also suffering from hallucinations; he saw
snakes coming out of the wall and the drain. Appellant also suffered from delusions about
devil worshipers being after him. Flores heard appellant say that he was about to jump the
fence, first off the bunk or from the sink, and he observed that appellant became very
violent, and was unable to reason at all. Appellant later began crying, became violent
again, and spoke of people dying and coming back. Appellant was restrained and a
fifteen-minute watch instituted. On July 4, 1992, an incident report reflected that appellant
again created a disturbance when he screamed, "[E]veryone is against me," and "I own this
place. You're going to die. . . . You're going to hell with the rest of them." He remained
uncooperative, was placed in wrist restraints, and was taken to a holding cell, where he
could be closely monitored.

 Wyatt testified that she believed that appellant wanted to hurt her grandmother, Mrs.
Munoz, because of Wyatt's prior relationship with appellant that had ended 12 years
earlier. Wyatt testified that, over the years, appellant wanted to get back together with her,
but she told him she did not want to. She stated that appellant never got over the fact that
she broke up with him and stated that the break-up was why he murdered her
grandmother, to get back at her. She also testified, at trial, that she believed appellant
wanted to hurt her grandmother because Wyatt prevented him from having a relationship
with her son, who appellant believed was also his son. In Wyatt's statement, made the day
after the incident, however, she stated, "I don't have any idea why he might have wanted
to hurt my grandmother." In her opinion, appellant was not mentally ill, but was making
everything up.

 Joel Kutnick, M.D., a psychiatrist, testified that he was appointed by the court to
evaluate appellant on the issue of insanity. Dr. Kutnick discussed his 1992 evaluation of
appellant and appellant's psychiatric history. He told the jury that he reached the diagnosis
of schizo affective disorder. (12) He believed that appellant was delusional, didn't make
sense, and spoke in gibberish. He also testified that he felt there had not been any
malingering by appellant. (13)

 As to his conclusions regarding the issue of insanity and, more specifically, whether
appellant knew his conduct was wrong or illegal, Dr. Kutnick testified as follows:

 Well, I felt that although, you know, this is a very serious event, that
[appellant] believed that these two wom[e]n were witches in his mind. He
wasn't doing -- he was getting rid of witches, rather than just killing people
out of meanness or revenge. And I think he was so ill, that it distorted his
mind so that he didn't realize what he was doing was actually against the law
or wrong.


Dr. Kutnick testified that "[appellant] essentially killed both ladies because he thought they
were witches. (14) In fact, he loudly announced in the hospital 'if you want to see what
witchcraft is,' and so in his mind he is ridding the world of evil." Dr. Kutnick further stated,
"I don't say it lightly, I mean, this was a brutal murder. But, yes, I do believe that he was
insane at the time and that he was so mentally ill, it distorted his mind that he saw that he
was ridding the world of evil witches," and that appellant "started toying with the idea some
time before that he had to get rid of the witches." Dr. Kutnick also testified that he "felt that
this was not just a religious thing." Appellant's thoughts were all mixed up with other
things, such as the F.B.I., Rock Hudson, AIDS, plots, the sheriff, and the President. In his
opinion, appellant was insane at the time of the offense. Dr. Kutnick thought the motive
for appellant doing what he did at Riverside Hospital was that he believed these two
women were witches and evil. A few weeks earlier, appellant had begun to concentrate
on the fact that witchcraft was going on and affecting him. Dr. Kutnick thought that
appellant was breaking down into a psychosis.

 Dr. Kutnick testified that the event was not planned out, or executed "with criminal
intent." Although, it appeared to "have been a little planned in terms of when he said in the
dentist's office somebody is going to get hurt," and he "started toying with the idea some
time before that he had to get rid of the witches," most people planning to commit murder
also plan to conceal it and not get caught. In this case, it was obvious, with appellant
having committed the murders in front of people, that he was going to get caught.

 After reviewing the police reports and witness statements, Dr. Kutnick got the
impression that appellant,

 wasn't acting like a criminal. In other words, he didn't really make any real
attempt to escape. He kind of sloughed down the hallway shouting, "if you
want to see witchcraft." You would expect somebody that had just stabbed
some people, if it was a real criminal thing, to try to get away, escape, run
out, go through the window, or even do the crime when there was nobody
around, and there were people around. So the whole setting didn't suggest
somebody that was just, quote, a mean murderer. It suggested somebody
that was ill.


Dr. Kutnick continued testifying as follows:

 Basically [insanity] boils down to you are so ill that in your mind what you are
doing is a good thing, and so distorted, so they have to be ill enough
because I've seen many mentally ill people that I didn't think were insane,
that they still understood what they were doing was wrong in terms of the
laws of the United States. The mental illness has to so distort your mind that
in your own mind you're doing something right and good. And as much as
I know about him, I honestly believe he was ridding or trying to rid the world
of evil witches.


 Dr. Kutnick concluded by stating that in appellant's mind, because of the illness, he
didn't know that what he was doing was wrong or illegal. According to Dr. Kutnick,
appellant thought he was doing good. When someone is insane, "they have to be so ill
that whatever action they're taking, their mind is distorted as they're doing something
worthwhile or good. . . . [Appellant] fits the definition of being insane at the time of the
murders."C. Analysis

1. Appellant's Contentions

 Appellant contends that the facts and circumstances of the offense reveal that he
did not understand that his actions were wrong or illegal. We agree.

 In determining the issue of insanity, the jury may consider appellant's demeanor
before and after the offense. See Graham, 566 S.W.2d at 951. In this case, the testimony
revealed that appellant's demeanor before and after the offense included his concerns with
witches and witchcraft, which had been apparent for many months, if not years, before the
events occurred. Appellant talked with his mother about witchcraft and told her that the
world was full of witchcraft and that he needed to do something about the witches in the
world. Friends and relatives testified that two to three weeks before July 1, 1992, appellant
talked of witchcraft and hexes and was expressing grandiose delusions, claiming to be
God, the President of the United States, and Ross Perot. The morning of July 1,
appellant's behavior was not normal. He appeared at two locations near the hospital--a
dental office for an appointment he did not have, and at a bank to withdraw money from
an account that had been closed long ago. Appellant also displayed delusional behavior
the morning of the stabbings, claiming to be "Dr. C.J." and the owner of the bank.

 When appellant arrived at the hospital on July 1, he attacked the victims while Flynn
was in the doorway of the room. According to Flynn's testimony, appellant began by
stabbing an object between the women, perhaps a pillow, suggesting irrational behavior. 
Leza's testimony that appellant was pacing and saying in an angry tone, "You want to see
witches, I'll show you witches, come in here and I'll show you witches," supports a
conclusion that appellant was operating under some delusion caused by his mental illness
and that he did not know his conduct was wrong or illegal. Also, appellant had been to see
Mrs. Munoz days earlier with his mother and knew her as a family friend. He did not know
Mrs. Kocurek. Yet, appellant called both women witches after he killed them.

 Flynn testified that appellant seemed in control after committing the offense, "sort
of walking like, just leave me alone, get out of my way, kind of staggering, . . . talking to
[people] . . . his attitude was just like, just leave me alone, just get out of my way, just go
away." Nolan testified that as appellant left Room 109, she asked him to put the knife
down and he said: "I'm powerful. I am great. Look what I have done." After she asked
him again to put the knife down and go away, he looked at her and responded, "Oh, yeah,
sure," and then walked off down the hall. Nolan concluded that appellant acted like he did
not know why she was asking him to put down his knife and go away.

 Vasquez testified that appellant talked about witches after he committed the offense. 
Appellant looked normal as he said, "las mate por que eran brujas"--he killed them
because they were witches--and "brujeria, I killed them because of brujeria." Although
Bernal testified that appellant said he was sorry, Vasquez did not hear appellant utter those
words, either in English or in Spanish. Appellant's demeanor was described as normal and
calm by Vasquez, police officers, and Judge Tamez, all who saw him after the incident. 
Although the officers testified that appellant was quiet, passive, and posed no problem the
evening after he was in custody, they also testified that appellant muttered about witchcraft
and talked to an imaginary person. On the evening of his arrest, appellant called Rucker
from the jail and said he did not kill those people, that "[v]oodoo did." Also, appellant's
behavior and mental condition after his arrest, as documented by personnel at the Nueces
County Jail, established that he suffered from hallucinations, delusions, and a deteriorating
mental condition.

 The jury may also consider evidence regarding any attempts by appellant to elude
police and any attempts to conceal incriminating evidence. See id. According to Flynn,
appellant walked out of the room with the bloody knife in his hand. Appellant did not
attempt to hide it, dispose of it, or hurt anyone else with it. He walked very naturally and
did not run. Appellant did not say any threatening words to Vasquez and did not wave the
knife at him. Appellant appeared to have washed his hands while in the restroom. 
Vasquez waited approximately five minutes for appellant to come out of the restroom. 
Appellant did not appear to be attempting to hide. Vasquez testified that appellant had
folded the knife blade in his hand. There is no evidence of any attempt to conceal the
knife. Appellant offered no resistance when Vasquez detained him, relinquishing the knife
after Vasquez squeezed his hand. He appeared to be more concerned with Vasquez not
hurting his back than with the consequences of his actions.

 Finally, other possible motives for committing the offense may be considered in
determining whether appellant knew his conduct was wrong or illegal. See id. Dr. Kutnick
thought appellant's motive for killing the women was that he believed they were witches
and evil. The State provided Wyatt's testimony that appellant was trying to get back at her
for the breakup of their relationship as a possible motive for his actions, completely aside
from his asserted desire to get rid of witches.

 Based on the circumstances of the crime, we conclude that appellant's demeanor
before and after the crime supports the conclusion that his conduct was delusional such
that he did not know it was wrong or illegal. See id. Moreover, appellant made no attempt
to conceal incriminating evidence or evade arrest. See id. He expressed no regret or fear,
and, except for one person testifying that he heard him say, "I'm sorry," there is no
evidence of expressions of regret. See id. Rather, in this case, appellant's concern at the
time of his apprehension was that his back might be hurt. Also, there is no evidence that
appellant had knowledge of the serious legal consequences resulting from the murders of
these two elderly women. See id. Finally, in order to accept Wyatt's theory that appellant
was motivated by a desire to get back at her for the breakup of their relationship, we would
have to also accept her position that appellant was not mentally ill, but was making
everything up. See id.

 The evidence does not support the jury's rejection of appellant's affirmative defense
of insanity. Rather, it supports the conclusion that appellant was mentally ill, was not
malingering, and did not know his conduct was wrong or illegal. We conclude, therefore,
that the State did not present evidence or rebut the evidence provided by the defense,
either by lay testimony or by expert testimony, that could lead a reasonable jury to believe
that appellant knew his acts were wrong or illegal.

2. The State's Contentions

 The State asserts there was sufficient evidence for the jury to have found that
appellant knew his actions were wrong or illegal.


a. Challenge to Dr. Kutnick's Conclusion

 The State contends that Dr. Kutnick's written evaluations and his trial testimony lack
any basis for his conclusion that appellant did not know his actions were wrong. We
disagree.

 Dr. Kutnick provided a basis for this conclusion. He set out that immediately before
the incident, appellant was experiencing psychosis at the dental office and at the bank. 
Appellant went into the room and committed the offense, having spoken to Flynn seconds
before and with her present in the room. He walked calmly out of Room 109 and through
a hallway where there were a number of people. Appellant walked; he did not run. He did
not try to get rid of the knife. These events provided the basis for Dr. Kutnick's conclusion. 
He also testified that he thought appellant was not malingering.

 Additionally, Dr. Kutnick testified that appellant believed that the two women were
witches, that he was ridding the world of witches, rather than just killing people out of
meanness or revenge. This distorted his mind so that appellant did not realize what he
was doing was actually against the law or wrong. Appellant believed he was doing
something good. He did not plan or attempt to conceal his actions so as to not get caught.

 There was no real attempt to avoid being caught. Dr. Kutnick testified that it was
obvious, having committed the offense in front of witnesses, that appellant was going to
get caught. Dr. Kutnick testified that, after reviewing police reports and witness
statements, he got the impression appellant "wasn't acting like a criminal. In other words,
he didn't really make any real attempt to escape. Appellant kind of sloughed down the
hallway shouting, 'if you want to see witchcraft.'" Dr. Kutnick explained if the stabbings
were motivated by criminal intent, appellant would have tried to get away, escape, run out,
go through the window, or even commit the crime when there was no one around. 
Appellant thought he was doing a good thing; appellant's mental illness had so distorted
his mind that he thought he was doing something right and good. In Dr. Kutnick's opinion,
appellant was ridding or trying to rid the world of evil witches. In his mind, because of his
illness, appellant didn't know that what he was doing was wrong or illegal. He thought he
was doing good. Dr. Kutnick stated that when someone is insane, "they have to be so ill
that whatever action they're taking, their mind is distorted as they're doing something
worthwhile or good. . . . [Appellant] fits the definition of being insane at the time of the
murders."

 Dr. Kutnick also testified that it was "not just a religious thing." He thought
appellant's motive for doing what he did at Riverside Hospital was that he believed these
two women were witches and evil. He believes that, a few weeks earlier, appellant was
starting to concentrate on the fact that witchcraft was going on and affecting him. Dr.
Kutnick did not think appellant's fixation with witchcraft was a religious belief. He thought
that appellant was breaking down into a psychosis. We conclude that, in this case,
appellant's delusional state precluded him from knowing that his conduct was wrong or
illegal.


b. Appellant's Statements After the Stabbings

 The State also urges that appellant's statements that he killed the victims because
they were witches and his statement, "I did it," to Officer Looper show he understood that
others would consider his conduct wrong or illegal. However, these statements are
consistent with appellant's failure to attempt to escape. The comments are not evidence
supporting the conclusion that appellant thought his actions were wrong or illegal.

 Additionally, the State argues that appellant's statement that he was "sorry," as
testified to by Bernal, shows remorse and thus an understanding that what he had done
was morally wrong, or at least that others around him would consider it to be wrong. 
However, only Bernal heard this statement and testified to it. Vasquez did not. Moreover,
even had appellant said that he was sorry, taken in the context of the circumstances and
other statements made at that time, including "witchcraft, don't hurt me. My back hurts,"
the comments are nonsensical. They are more the result of his mental condition than
evidence of any understanding that appellant knew his actions were wrong or illegal.

c. Appellant's Actions During and Immediately After the Stabbings

 The State complains that appellant's actions at the time of the stabbings and
immediately thereafter were attempts to elude police and thus support a conclusion that
appellant had knowledge of the serious consequences of his action. It contends that
appellant clearly waited until anyone who might have stopped him left the room before he
killed the women. It also complains of appellant's attack on Nolan. The facts, however,
do not support these contentions. Furthermore, we do not believe the evidence that
appellant walked in and out of the room between killings clearly shows he was concerned
about being discovered or that he understood his actions would be seen as wrong by
others. Neither does the evidence establish that appellant avoided contact with Lambert
as he left Room 109; it only establishes that he looked in his direction and went the other
way. Finally, Kimbrue's testimony that appellant threatened to kill someone else in the hall
"if they got any closer" does not show evasive conduct because it was not established that
anyone was following him in the hallway; thus, his words were meaningless, unless they
were a function of his delusional state.

d. Appellant Demeanor Before and After the Murders

 The State also asserts that because appellant had coherent conversations with 
several witnesses after he committed the offense, in contrast to his interviews with Dr.
Kutnick, in which he was delusional, incoherent, and speaking only in gibberish, one could
draw a logical inference that appellant presented a different persona to Dr. Kutnick than
the persona he presented to those who were not evaluating his mental status. We
construe this assertion as suggesting appellant was malingering when he was with Dr.
Kutnick. The testimony of Dr. Kutnick and the testimony of all treating physicians,
psychologists, and social workers, however, establish that appellant was not malingering. 
Only Wyatt suggested appellant was making everything up.


e. Other Motives

 The State argues that appellant's statement to Ramos, close to the time of the
offense, that Wyatt and her family "put a spell on him," that "they were going to pay for
what they did to him," and that "he decided what kind of punishment they got," show not
only a motive for the killings, but amount to an admission that appellant was taking revenge
for someone in the Munoz family putting a spell on him. However, appellant also told
Ramos that he was God and that Wade, Wyatt's son, was Jesus, that he was President
of the United States, that he owned the whole world, and that he was Ross Perot. When
taken in context, these statements illustrate appellant's delusions and manic depressive
illness, not that appellant thought his conduct was wrong or illegal.

 The State also contends Wyatt's testimony that appellant was trying to get back at
her for the breakup of their relationship shows an additional motive for his actions,
completely aside from his asserted desire to get rid of witches. However, as set out above,
in her statement made the day after the incident, Wyatt stated, "I don't have any idea why
he might have wanted to hurt my grandmother." In order to accept Wyatt's asserted
motive, we would have to also accept her assertion that appellant was not mentally ill, but
he was making everything up. Rather, Dr. Kutnick concluded appellant's motive for his
conduct at Riverside Hospital was that he believed the victims were witches and were evil,
and that he was doing something good.


f. Appellant's Admissions in Prior Psychological Evaluations

 Finally, the State asserts that appellant's own statements noted in 1992 and 1994
psychological evaluations prepared by Dr. Kutnick are inconsistent both with each other
and with his later insanity defense at trial. (15) In 1992, Lopez claimed that no one killed the
women and that it was just a lie to get him indicted. In 1994, Lopez admitted that he killed
the women, but claimed that he must have "blacked out" at the time. At trial the insanity
defense depended on Dr. Kutnick's findings that appellant did not know his conduct was
wrong or illegal. The State argues that switching defenses clearly suggests an evolving
attempt to escape responsibility.

 We cannot agree with the State that appellant's statements are inconsistent or that
appellant has switched defenses, suggesting an evolving attempt to escape responsibility. 
Appellant had been in the hospital for at least twelve years at the time of trial. He had
received treatment, including, among other things, counseling and a medication regimen. 
The reports provide an insight into the evolving nature of appellant's treatment and his
mental condition--not his trial strategy. It is undisputed that the testimony in this case establishes that appellant suffers from
a schizoaffective disorder and/or schizophrenia--a serious mental disease. Considering
all the evidence relevant to appellant's affirmative defense of insanity, we must now
conclude that the judgment in this case was overwhelmingly against the great weight and
preponderance of the evidence on the question of whether, at the time of the conduct
charged, appellant knew the conduct was wrong or illegal. See Bigby, 892 S.W.2d at 875. 
No rational jury could decide from the evidence presented that appellant was able to
appreciate the wrongfulness of his conduct; that appellant understood the nature and
quality of his actions, and that his conduct consisted of actions he ought not to do or that
others believed his actions were wrong. A rational trier of fact could not have resolved the
conflicting testimony regarding legal insanity against appellant. We conclude that the jury's
decision to reject the insanity defense was so against the great weight and preponderance
of the evidence that it was manifestly unjust. Id.; Meraz, 785 S.W.2d at 155; Reyna, 116
S.W.3d at 367. While acknowledging that expert testimony does not dictate the result in
this case, see Graham, 566 S.W.2d at 949, the rejection of the insanity evidence provided
by both lay and expert witnesses appears arbitrary to this Court. Appellant's sole issue is
sustained.

III. Conclusion

 For the foregoing reasons, the judgment of the trial court is reversed and the cause
is remanded for a new trial.

 

 NELDA V. RODRIGUEZ

 Justice


Do not publish. 

Tex. R. App. P. 47.2(b).


Memorandum Opinion delivered and 

filed this 31st day of August, 2007.
1. We note that the indictment incorrectly refers to section 19.03(a)(6) of the penal code.
2. At the time of trial, the hospital was known as Northwest Regional Hospital.
3. Appellant and Mrs. Munoz lived in the same neighborhood. Appellant had grown up with her children
and grandchildren. Members of appellant's family were married to members of the Munoz family. Appellant
had dated Mary Lou Wyatt, Mrs. Munoz's granddaughter, for about four or five years from approximately 1975
to 1979 or 1980.
4. After Mrs. Lopez found out what had happened at Riverside Hospital, she called MHMR and told
them it was too late.
5. Mrs. Lopez testified that she was a patient of Dr. Cody's and had an appointment with him on June
30, 1992. Appellant went with her to her appointment and then to Riverside Hospital to visit Mrs. Munoz.
6. There was also testimony that appellant may have seen a patient's bill at the dental office that had
-$64.00 entered on it.
7. Joseph C. Rupp, M.D., the medical examiner, testified that Mrs. Munoz sustained thirteen actual stab
wounds; including a slashed throat and nine defensive wounds. Her cause of death was the direct result of
multiple stab wounds, the manner of death was ruled a homicide.
8. According to Dr. Rupp, Mrs. Kocurek sustained ten stab wounds and five defensive wounds.
9. Kimbrue testified that she did not see the person that was coming behind appellant. She thought the
threat was made to somebody, but she did not see who was behind him. She did not know if he was talking
to himself. After appellant entered the bathroom, a security guard arrived and told her to get out of there.
10. Vasquez testified that he did not see a woman (specifically, Kimbrue) standing in the hallway by the
telephone.
11. Flynn also testified it was strange that after appellant was restrained he would say "'oh, my back,'
after what he had done that he would be so sensitive . . . to his own treatment at this point," "that he would
complain about himself and want to be treated so nicely when he was certainly not nice to those ladies, or the
rest of us." She, too, testified that appellant offered no resistance.
12. Dr. Kutnick explained that "schizo affective disorder means . . . someone . . . has features of two
serious mental illness: schizophrenia, which is a thinking disorder where the person hears voices, can get
paranoid, their thinking processes are very illogical and may behave in very inappropriate ways . . . [and]
manic depressive illness, particularly mania in that the grandiosity that he was the sheriff and the President
and Ross Perot and that he owned the bank, those are real grandiose statements that a manic feels so
powerful, that everybody else is kind of like a little slave, and they're the king, and so they make this
outlandish, grandiose statements."
13. Except for Wyatt's testimony that she believed that appellant was making all of this up, the evidence
supports the conclusion that appellant was not malingering.
14. During oral argument, the State conceded that appellant probably thought that one of the two women
was a witch based on his delusional state.
15. We note that the 1992 and 1994 evaluations were marked and admitted pre-trial as
defendant's exhibits 9 and 17. On direct examination, defense counsel questioned Dr. Kutnick
regarding these reports.